HENRY MATTHEWS *vs.* SARAH WARD AND OTHERS.—*December*, 1839.

The ancient law requiring livery of seizin to give efficacy to deeds of feoffment, is abolished in this State, and enrollment now is equivalent to livery.

By the usage and practice of this State, *bargains and sales,* as a mode of passing estates, have nearly superseded all other modes of conveyance.

In a deed of bargain and sale, the use is executed in the bargainee by the statute, and the limitations to use, are merely trusts in chancery, the cestui que trusts being seized only of an equitable estate.

The Lord Proprietary of Maryland, by the terms of the charter, held his lands in free and common soccage, and his grantees, anterior to the revolution, held by the same tenure, feudal services, with their incidents being attached to his grants.

These services and incidents were in effect abolished by the revolution, and escheats, though they continued, changed their character; the land, instead of going to the lord of the fee, reverting to the State as property without an owner.

After the revolution, lands in this State became allodial, subject to no tenure, nor to any services incident thereto, and under our acts of assembly, the State succeeded to the property, whether the owner dying without heirs, had a legal or equitable estate.

The term seized, in our law, does not always refer to a *legal* seizin, but will have a more extended signification, when necessary to effectuate the design of the legislature.

* Lands held in trust in this State are liable to escheat when the cestui que trust dies without heirs.

An action of ejectment may be maintained by a trustee against his cestui que trust, unless, as under certain circumstances may be done, a conveyance of the legal title is presumed.

The right of entry in the lessor of the plaintiff will support an ejectment, although the lessor has never made an actual entry, which is superseded by the common consent rule, at least such is the effect of the rule, where the parties stand in the relation of landlord and tenant.

Although equitable titles will escheat where the owner dies without heirs, still, in an ejectment by the trustee or his grantee against the party claiming under the escheat, the legal title will prevail, the remedy of the defendant being in equity.

APPEAL from *Anne Arundel* County Court.

This was an action of *Ejectment*, commenced on the 12th August 1837, by *Sarah Ward*, *Smith Boston* and others, lessors of the plaintiff, against *Henry Matthews*, the tenant in possession, for a lot in the city of *Annapolis*.   The defendant appeared and pleaded not guilty, and the parties agreed upon the following statement of facts:

It is admitted in this case, that at and prior to the 20th of October 1817, *Leonard Scott* and *Sarah Scott* his wife, were seized in fee simple of the lot and premises in the declaration in this action mentioned, and being so seized, that they executed, acknowledged and delivered the following deed, which was recorded in due time among the land records of *Anne Arundel* county.

This Indenture, made this twentieth day of October, in the year of our Lord one thousand eight hundred and seventeen, between *Leonard Scott* and *Sarah Scott* his wife, of the city of *Annapolis*, in *Anne Arundel* county and State of *Maryland*, of the one part, and *Henry Price* of the city, county, and State aforesaid, of the other part, witnesseth, that the said *Leonard Scott* and *Sarah Scott* his wife, for and in consideration of the sum of five dollars to them in hand paid, the receipt whereof they do hereby acknowledge, have, and each of them hath given, granted, bargained and sold, and by these presents do, and each of them doth, give, grant, bargain and sell, unto the said *Henry Price*, his heirs and assigns, a part of a house and lot, piece or parcel of ground, situate, lying and being in the city

of *Annapolis*, which was formerly occupied by captain *James West* as a tavern, and described as follows: Beginning at a brick partition wall on church street, about midway the house, then, &c.; to have and to hold the said lot, piece or parcel of ground and premises above described, and the goods and chattels before mentioned, unto the said *Henry Price*, his heirs and assigns forever; in trust to and for the uses, intents and purposes, that is to say, in trust for the use of the said *Leonard Scott* and *Sarah Scott* his wife, for and during their joint natural lives, and the life of the survivor of them, and after the death of the said *Leonard Scott* and *Sarah Scott* his wife, to have and to hold the said lot, piece or parcel of ground and premises above described, and the goods and chattels before mentioned, in trust for the use of *John Henry Scott* and his heirs forever; and in case the said *John Henry Scott* should die without lawful issue, then to have and to hold the said lot, piece or parcel of ground and premises above described, and the goods and chattels before mentioned, in trust for the use of the heirs of *Lucy Ward*, wife of *James Ward*, which said *Lucy Ward* is the daughter of the said *Leonard Scott*. In witness whereof, the said *Leonard Scott* and *Sarah Scott* his wife have hereunto subscribed their names and affixed their seals the day and year, &c.

It is further admitted that, the grantors in said deed, and the said *John Henry Scott*, therein mentioned, are all dead, the latter having died in the year 1825, intestate, unmarried and without heirs, and in the life time of *Lucy Ward*, mentioned in the aforesaid deed, and that the lessors of the plaintiff, to wit, *Sarah Ward*, *Elizabeth the wife of Smith Boston*, *Sophia* the wife of *Stephen Queen*, and *Martha Ward*, are the children and heirs of *Lucy Ward*, the daughter of *Leonard Scott*, mentioned in said deed, *who survived said John Henry Scott and has lately died*.

It is further admitted, that subsequently to the death of the grantors in said deed, and of the aforesaid *John Henry Scott*, and of *Lucy Ward*, but prior to the commencement of the pre-

sent action *Henry Price*, the grantee in said deed, executed the following deed to the female lessors of the plaintiff.

This Indenture, made this seventh day of August, in the year of our Lord one thousand eight hundred and thirty-seven, between *Henry Price* and *Ann Price* his wife, of the city of *Annapolis*, in the State of *Maryland*, of the one part, and *Sarah Ward*, *Elizabeth Boston*, *Sophia Queen* and *Martha Ward* of the city of *Baltimore* and State aforesaid of the other part— Whereas, by an indenture bearing date on the twentieth day of October, in the year one thousand eight hundred and seventeen, a certain *Leonard Scott* and *Sarah* his wife, then of the city of *Annapolis*, conveyed to the aforesaid *Henry Price* upon certain trusts therein mentioned and declared, a part of a house and lot, piece or parcel of ground, situate, lying and being in the aforesaid city of *Annapolis*, which was formerly occupied by captain *James West* as a tavern, and described as follows, &c.; and whereas, in consequence of the death of some of the cestui que trusts in said deed mentioned, doubts are entertained whether the entire interest in said property, legal and equitable, hath not devolved on the said *Henry Price*, notwithstanding the survivorship of the grantees in this deed, who are the heirs of *Lucy Ward*, wife of *James Ward*, spoken of in the aforesaid deed from *Leonard Scott* and *Sarah* his wife, to *Henry Price;* and whereas the said *Henry Price* in consequence of those doubts is willing to execute these presents, in order that the true purposes of the deed to him may be accomplished—Now this Indenture witnesseth, that for and in consideration of the before recited premises, and of the sum of five dollars current money, by the said *Sarah Ward*, *Elizabeth Boston*, *Sophia Queen* and *Martha Ward*, to the said *Henry Price* and *Ann Price* his wife in hand paid, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, they the said *Henry Price* and *Ann Price* his wife, have bargained and sold, aliened and enfeoffed, and by these presents do give, grant, bargain and sell, alien, enfeoff, release, convey and confirm, unto the said *Sarah Ward*, *Elizabeth Boston*, *Sophia Queen* and *Martha Ward*, their heirs

and assigns, as tenants in common, all the before mentioned and described piece, parcel, or lot of ground, &c., and all the estate, right, title, and interest whatsoever, at law and equity, of them the said *Henry Price and Ann Price* his wife, to have and to hold the said herein described premises, with the appurtenances thereunto belonging, unto the said *Sarah Ward, Elizabeth Boston, Sophia Queen* and *Martha Ward,* their heirs and assigns forever. In testimony whereof, the said *Henry Price* and *Ann Price* his wife have hereunto set their hands and seals, the day and year first above written.

It is further admitted, that on or about the 30th of September, in the year 1836, after the death of *John Henry Scott,* and of the grantors in the aforesaid deed, *Henry Matthews,* the defendant in this action, took out an *escheat* warrant from the proper office, had the same executed upon the said lot and premises, paid the composition money into the treasury within the time required by law, and obtained a patent therefor; that prior to the issuing of said patent *Henry Price* caveated the same before the execution of his said deed to the lessors of the plaintiff, which caveat was overruled after argument.

That the defendant has been in possession of the premises in question ever since the date of his patent on the        day of        18    , and that he had been in possession thereof for several years previous to the said date, having entered into possession in the life time of *Leonard Scott,* and as his tenant; but has never recognized the rights of the said *Henry Price* or of the lessors of the plaintiff.

Upon this statement the question arises, whether the lessors of the plaintiff are entitled to the premises in question. If they are, then judgment is to be entered for the plaintiff, otherwise judgment is to be rendered for defendant, and either party may appeal to the Court of Appeals, and execution of any judgment rendered, is to be stayed until the determination of such appeal.

Upon this statement the county court rendered judgment in favor of the lessors of the plaintiff, the grantees under the

deed of the 7th August, 1837, and thereupon the defendant below, *Matthews*, prosecuted the present appeal.

The cause was argued before BUCHANAN, C. J., ARCHER, and CHAMBERS, J.

By T. S. ALEXANDER and R. JOHNSON for the appellants, and

By J. JOHNSON and A. C. MAGRUDER for the appellees.

ARCHER, J., delivered the opinion of this court.

It is contended by the appellant, that the deed from *Scott and wife* to *Price* is a deed of feoffment; and as such, the legal title of the property vested by the statute of uses in *John Henry Scott* in fee; that the remainder over as being too remote was void, and that upon the death of *John Henry Scott* without heirs, the property of course became liable to escheat.

If by the words of the deed and the intention of the parties we could construe this as a deed of feoffment, there would arise no objection to such a result, from an absence of evidence of livery of seizin. The ancient law on the subject of feoffments, which demanded livery of seizin to give them efficacy, we consider as having been abolished, and that *now*, enrollment takes the place of livery, and is equivalent to it. The act of 1766 provided for the enrollment of deeds of feoffment, as well as other deeds, and the act of 1715 declared that livery should not be necessary where the deed was enrolled. Anterior to the law of 1766, ch. 14, although the legislature had rendered livery of seizin unnecessary, *where the deed was enrolled, omitted making any provision for the enrollment of deeds of feoffment* until 1766; hence it was decided by the *General Court*, in 1 *Harr. & John.* 527, that a deed executed in 1726 could not operate as a deed of feoffment without proof of livery of seizin, or such length of possession as would give rise to a presumption of livery of seizin. *Vide Carroll vs. Norwood,* 1 *Harr. & John.* 178.

Although since the act of 1766, ch. 14, which provided for the enrollment of deeds of feoffment and other conveyances,

livery of seizin is not necessary to a deed of feoffment, yet whether this be a deed of feoffment or a deed of bargain and sale, is a question of construction, depending on the words of the instrument. There is no doubt but that it would be capable of transferring the estate, either, as a feoffment, or a deed of bargain and sale—the operative words of each species of conveyance being used. But the question is not whether, if it cannot operate in one way, it shall in another; but whether the conveyance is in point of law a feoffment, or a bargain and sale.

By the usage and practice of the *State*, bargains and sales, as a mode of passing estates, have nearly superseded all other modes of conveyance, and we do not believe it was at all designed, in the execution of the deed under consideration, to deviate from this accustomed mode. Nothing could more unequivocally impress a distinctive character on the instrument, than the words which have been used: the terms *"bargained and sold"* follow the words "given and granted," and qualify the mode of the gift and grant, and show that it was by a bargain and sale; and it is said that the insertion of the words "bargain and sale," in conveyances by lease and release, were inserted among the operative words of this conveyance, that the lease might be treated as a bargain and sale, and not a lease at the common law. *Cornish on Uses,* 74. Other considerations might be adduced from the limitations of the deed, conducing to the same conclusion, that this is a deed of bargain and sale; but it is perhaps unnecessary to advert to them, as the above view strikes us as satisfactory.

If this be a deed of bargain and sale, as we think it is, then the use was executed in the bargainee, and the limitations to use are merely trusts in chancery, and the *cestui que trusts* are seized only of an equitable estate, and the question has been discussed whether such an estate is liable in this *State* to escheat.

The case of *Burgess and Wheat*, 1 *Eden,* 177, and reported likewise in 1 *Wil. Blac.* 123, may be considered as having settled the *English* rule on this subject, though much dissatisfac-

tion has at various times been expressed at the decision. That the death of *cestui que trust*, without heirs, did not operate as a forfeiture to the lord, was founded on the feudal idea of tenure, the trustee being *in esse*, and being in the legal seizin of the land, was the tenant possessing capacities to perform the feudal services; as against him the king possessed no equity. *Judge Tucker*, in 3 *Leigh.* 518, in speaking of *Burgess and Wheat*, says, there can be nothing more unreasonable than this decision of *Burgess and Wheat*, if we consider it in any other light than as a mere question of tenure; that the trustee should be permitted upon the death of the beneficial owner without heirs, to hold the estate to his own use, is utterly at variance not only with the principles of equity, which consider him a mere machine, an instrument, a conduit, which declare that trust and legal estates shall be governed by the same rules, and that the trust shall descend and pass as the legal estate would descend and pass; but it seems to me at variance with the natural justice of the case. It is right and proper that, when the owner of property dies without giving it away, and without leaving any objects having natural claim to his bounty, such as heirs or next of kin, his property should go to the community of which he is a member. The ground upon which the *English* rule on this subject can alone be maintained, and upon which it was established, is on the principle of tenure, and it becomes therefore important to enquire, whether the doctrine of that case would be supported in this State upon the same ground.

The *Lord Proprietary*, by the express terms of the charter, held his lands in free and common soccage, and his grantees, or tenants, anterior to the revolution, held by the same tenure. Services of a feudal character, or of the nature of feudal services, were attached to his grants, and the incidents of *fealty*, rent, *escheat and fines* for alienation or some of them, were the necessary incidents thereto. At the revolution, when the people of the State assumed the powers of government, and the right theretofore existing in the proprietary, these services and incidents were in effect abolished; thus the oath of allegiance

to the State superseded the incident of fealty; quit rents were abolished, and grants were made without being subject to fine on the alienation of the grantee; and escheats, though they existed, had essentially changed their nature, no longer being technically founded on the same principles. Instead of going to the lord of the fee, who took the land in lieu of the services, because by the death of the tenant without his heirs there was no one to perform the feudal services; they reverted to the State as property without an owner, upon a principle of justice, that the whole community should hold the derelict property for the benefit of all. After the revolution, therefore, lands became allodial, subject to no tenure, nor to any of the services incident thereto, and if allodial, the supreme power of the State would succeed to them as the king would succeed to allodial property in *England*, by the common law, upon the death of the owner without next of kin. It is said by *Lord Mansfield*, in 1 *Wil. Black*. 163–4, "In personal estates which are allodial by law, the *king* is last heir where no kin, and the king is as well entitled to that as to any other personal estate." And accordingly, where one dies intestate, without wife or kindred, *Sir William Blackstone*, 2 *Black. Com.* 505, says, that the usual course now is for some one to procure letters patent from the crown, or other authority from the king, and then the ordinary of course grants administration to such appointee of the crown. Thus the king as *parens patriæ* is entitled to the property thus situated, and takes it as a general trustee of the kingdom. In analogy, therefore, to the admitted condition of allodial property, and in conformity to the reason and justice of the thing, when the owner of real estate dies without heir, the State is *ultimus hæres*, and takes the property for the benefit of all.

This being the undoubted right of the State, we approach the examination of the acts of assembly passed in relation to this subject. The acts of 1780, ch. 51, and 1781, ch. 20, authorized escheat warrants to be granted, when any person died seized of the lands, without specified heirs, and the act of 1794, ch. 60, authorised a sale of the lands of any person

seized or possessed, or having an equitable title thereto, where such person should die without known heirs indebted, on the application of a creditor, and directs the proceeds of sale, after payment of debts, to be paid into the treasury for the use of the State, and directs the mode by which the purchaser of such equitable estate may acquire a conveyance of the legal title. So far as regards the sale of the estate of the equitable owner, over and beyond what was necessary to pay debts, this act undoubtedly operated as an appropriation of such lands, or the proceeds thereof, to the public use, where there existed no heir, and could only have been passed upon the assumption, that the right to such land existed in the State. It is both prospective and retrospective, and could never have been passed, if the trustee had been supposed to possess any thing else than a perfectly *barren title.* The rights of such trustee, who is a mere instrument, are treated with no respect, and the State deals with the property as her own. The law gives the trustee no power to retain the estate by paying the debts, however small they may be. Does not order a part (however small that might be, which might be necessary to pay the debts,) but the whole to be sold, and the *surplus* to be paid into the treasury for the use of the State, and strips him of every vestige of right, by directing a conveyance to be made by him to the purchaser. A stronger case could not be presented from which to deduce the views of the legislature; and these views it will be perceived, accord with our opinions of her rights. The acts of 1780 and 1781, above adverted to, declare lands to be escheated, and escheat warrants to be granted, where any person dies seized of lands. Now if an escheat warrant was an inappropriate mode of procuring the title of the State to trusts which had thus fallen in, it would furnish no argument against the equitable ownership of the *State,* who, in virtue of the death of the *cestui que trust* without heirs, stands in his place and stead, and is clothed with all the rights which he had, and which rights it would be competent for the State to transmit in such mode and form as she might prescribe. Whether, however, a transfer by escheat is the appropriate mode of convey-

ing the interest of the State in such lands, will depend upon the construction which is to be placed upon the act of 1780, ch. 51. That act declares, that any person dying seized, &c., without heirs, his estate shall be escheated, and warrants may be issued. By the true construction of these acts, is such a warrant only to issue on a legal seizin, or are we to give such a construction to the acts, as shall be commensurate with her rights? We have seen that she was entitled to the property just as much as if there had been a legal ownership, as she succeeded in all respects to the right of the beneficial owner, who being clothed with a trust, was seized in the eye of a court of equity of the lands; so seized that legal estates might have been carved out of it. For of a trust estate, there shall be tenancy by the curtesy, and now by the laws of this State dower.

It will be perceived that the act of 1780 and the act of 1781 were passed under circumstances of peculiar emergency, particularly the first law—the design being to raise funds for the immediate relief of such of the troops who were prisoners, clothing for the recruits, and a sum to defray the immediate and necessary expenses of the government; and it is entitled, an act to procure a loan for the sale of escheat lands and confiscated British property therein mentioned. A liberal construction ought therefore to be given, at all events, to such parts of the act as deal with the State's own property, that thereby the design of the legislature should the better be accomplished. If it be admitted, that the terms used would naturally import a legal seizin, still there is no reason to confine them to a legal seizin, when the design and object is looked to. On the contrary, these considerations would induce us to give them a more enlarged signification, and extend them to an equitable seizin. The State was designing the more effectually to secure a loan, by subjecting her lands to sale, and we can divine no reason why equitable seizins should have been exempt from sale, more than legal seizins, to accomplish the great objects she had in view; and the more especially, as fourteen years afterwards, she in specified cases ordered the

sale of such lands in part for the public benefit; and besides this authorization to sell, escheat lands are placed in the same category with confiscated lands, the sale of which passed both the legal and equitable titles, and operated on each. The word seized has in many cases been extended to equitable interests. Thus in the act of 17 *Geo.* III. requiring the registration of annuities, a clause thereof excepted annuities, secured upon lands of greater.or equal value, whereof the grantor was seized in fee simple, or fee tail in possession, at the time of the grant, and the question arose, whether the exception applied to an equitable, as well as a legal seizin, and lord *Thurlow* decided, that an estate in equity in fee simple, or fee tail, was in that respect the same as if it were a legal estate; and he further remarked that, in many acts of Parliament, an equitable estate is considered the same as if it were a legal estate. The words, seized in law or in equity, in the qualification act show that, the word seized is applicable to both, and in the act of 1794, ch. 60, sec. 5, the word seized is applied to an equitable estate—and in the act of 1786, ch. 45, entitled an act to direct descents, prescribing a rule for the descent of lands, the terms seized of lands, tenements and hereditaments in fee simple or fee tail, have reference both to a legal and equitable seizin of lands. We might refer to other acts of assembly illustrative of this view, and to show that the term seizin, when used in our law, does not always refer to a legal seizin, but will have a more extended signification when it shall be necessary to effectuate the design of the legislature.

If these views be correct, and we think they are, the land held in trust in this case was liable to escheat. *Matthews* having taken out an escheat warrant and procured a patent thereon, the next inquiry is, whether it gave him the legal title, and it is insisted that it did, in virtue of the statute of 1 *Rich.* 3, ch. 1. This statute was confined by its terms to uses. It may therefore be doubted whether it applies to modern trusts, and it is questionable whether it is in force in this State. Cases coming as it would appear within the terms of the statute, if it applies at all to trusts, have been excluded. Thus it has

been held, that this statute does not apply to the trusts of a term. 7 *Term. Rep.* 47. So it has been held, that a feoffment by the cestui que trust of a term, without the consent of the legal termor, does not destroy the term. *Doe Ex. Dem. of Maddock vs. Lynes,* 3 *Barn. & Creswell,* 388. The universal practice, never to rely on the conveyance of the *cestui que trust* for passing the legal estate, but to require the conveyance of the trustee for that purpose, which practice is admitted to exist, in *Cornish on Uses,* 33, is very strong to show that the statute of *Richard* 3 does not apply to trusts; for if it did apply to trusts, then the *cestui que trusts* could convey the legal title, and the concurrence of the trustee would be wholly unnecessary.

It is urged, that if the patent does not convey the legal title, but only such estate as the State acquired, as succeeding to the rights of *John H. Scott,* that still the trustee *Price* could not recover by *ejectment* against the *cestui que trust,* and by consequence could not recover against the State or its assignee, standing in the place of the *cestui que trust:* and in support of this position 1 *Henry Black.* 461. 3 *Bur.* 1901. *Cowp.* 473, 597. 4 *Burr.* 2208, have been cited.

In the former case it was decided, that a *bona fide* lease, made by an equitable tenant in tail, will prevent the trustee in whom the legal estate is vested, from recovering in ejectment against the lessee. *Adams on Ejectment,* 86, observes, with regard to this case, that from the more recent decisions, the principle seems to have been much shaken, and it is now very doubtful whether, in any case, a lease from the *cestui que trust* can be set up against the trustee without the aid of a court of equity. 10 *Ves.* 554. In 3 *Bur.* 1901, *Lord Mansfield* said, the formal title of trustee could not be set up against the title of *cestui que trust,* but these decisions have been receded from, and it has been repeatedly decided, that the legal estate shall prevail against the equitable title. 2 *Term. Rep.* 684. 7 *Ib.* 43, 47. 8 *Ib.* 2, 122. 5 *East.* 138. To prevent the inconvenience growing out of this rule, the jury will in particular cases be allowed to presume that, a regular surrender has been

made by the trustees of the estate to the *cestui que trust*, as if the purposes of the trust has been satisfied, or the occupation of the estate has been such as to induce the belief of a conveyance, or where the trust is a plain one, and a court of equity would compel the trustee to make a conveyance. But in none of these cases can the presumption be made by the court, where the merits of the case would have warranted such a presumption at the trial, if it appear upon a special verdict or case stated, that the trust estate, though satisfied, is still outstanding in the trustees. 7 *Term. Rep.* 43. *Adams on Eject- ment*, 87.

In 8 *Term. Rep.* 118, 123, it was decided, that a trustee might maintain an ejectment against his *cestui que trust*. The same doctrine prevails in *New York*. If the plaintiff have the legal title, the defendant cannot set up an equitable title, and *Thompson*, in delivering the opinion of the court, in 2 *John.* 226, says, the only way in which an equitable title can be assisted at law is, by allowing the presumption in certain cases to prevail, that there has been a conveyance of the legal estate. It has been argued, that *Matthews* was a tenant at will to the trustee, and that the action was not a sufficient determination of the will. If the action be not a sufficient determination of the will, we think the deed from *Price* to the plaintiff, dated and recorded before the date of the lease in the declaration, operates such a determination of the will, and vested the right of possession in point of law in the plaintiff. Having then the legal title, and the right of possession, the plaintiff might have enforced his right by a peaceable entry upon the premises. But an actual entry in such case is not necessary. The right of entry in the lessor of the plaintiff will support an ejectment, although the lessor has never made an actual entry, the common consent rule supersedes the necessity of an actual entry. Vide *Adams on Ejectment; Comyn on Landlord and Tenant*, 489. Upon the argument, this case is assumed to be a tenancy; we mean not to decide the question, how far the common consent rule would dispense with the necessity of actual entry in other cases.

But it is said, that the plaintiffs, who have received the conveyance from *Price*, cannot maintain this action; first, because the deed to them was a breach of trust. Admitting it to be so, it is perfectly clear that, setting in a court of law, we cannot treat the deed as a nullity on this account. Breaches of trust come within the jurisdiction peculiarly of a court of equity. It is said the court should not execute the use as regards this deed, but treat it as a nullity; and it is emphatically asked, if a court of law would consider itself bound to execute the use however nefarious. There are no circumstances connected with the deed which would induce us to treat it as fraudulent or void; on the contrary, the intention as disclosed did not partake of a covenous character. The title to the property was involved in doubt, and the grantee not desiring, if he had acquired any right, to hold it against the intention of the grantors, he conveyed it, that his title, whatever it might be, should pass to the children of *Lucy Ward*—the objects, undoubtedly, of the benevolent intentions of his grantor. We perceive nothing in the character of the deed, which would render it obnoxious to the objection which in this respect has been taken to it.

It is further urged that, the deed to the lessors of the plaintiff is void, because executed while *Matthews* was in the adverse possession of the property. But we do not think he was in the adverse possession. The possession of the *cestui que trust* is the possession of the trustee. He came in as tenant of the *cestui que trust*, for life, and afterwards held it without any adverse acts on his part, unless the failure to recognize the rights of the trustee amount to an adverse possession. To give the character of adverse to a holding, there must be some positive act, and not merely a failure to recognize the rights of trustee. Previous to his application for an escheat warrant, it cannot be pretended that any thing adverse was done by him. His holding, therefore, must be referred to his original occupancy, and must take its character from that. This brings us to the inquiry, whether his claim under his escheat warrant and patent granted thereon, constituted him an adverse pos

sessor of the property, and we think they did not. It was only a legal title which existed in *Price,* and the State succeeding to the rights of the *cestui que trusts, Price* was in fact a trustee for the State, and *Matthews,* coming in under the title of the State, must have the same relation to *Price* which the S'tate had. The possession therefore of *Matthews,* was the possession of the trustee. But if there was any doubt about this, we could not adjudge the deed to be void. With what intention *Matthews* held the land, and whether the possession was adverse, was a question of fact, which a jury, and not the court, would have to determine. 2 *Harr. & McHenry,* 76. *Adams on Ejectment,* 505, *Appendix,* and the authorities there referred to.

We are therefore of opinion that the plaintiff is entitled to recover at law, and that the remedy of the defendant is in equity.

JUDGMENT AFFIRMED.