# THE MARYLAND COAL AND REALTY COMPANY *v.* JONATHAN J. ECKHART ET AL.

[No. 781, September Term, 1974.]

*Decided April 8, 1975.*

The cause was argued before ORTH, C. J., and DAVIDSON and LOWE, JJ.

*Hugh A. McMullen,* with whom were *William H. Geppert* and *Geppert, McMullen & Paye* on the brief, for appellant.

*G. Douglas Reinhart, Marvin I. Singer* and *J. Michael Lawlor,* with whom were *Robert L. Sullivan, Jr.,* and *Sullivan, Wiesand & Singer,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

That "any person may obtain a patent for vacant land" from the State may come as a surprise in this day and time.[1] The authority is the vestige of a thriving real estate business conducted centuries ago and inherited from our British

---

[1] A land patent is defined as used in American law by *Black's Law Dictionary:*

"The instrument by which a state or government grants public lands to an individual."

progenitors. As recently as 1972 the Maryland General Assembly completely revised the land patent procedures "to provide a simple and convenient method for obtaining such patents." Laws of Md. 1972, Ch. 349.

The State's authority to patent lands derives from its sovereign heritage. In 1631 the royal charter of Charles I granting what is now Maryland to George, Lord Baron of Baltimore, "authorized [him] to create manors, with courts baron and all things appertaining to them, with views of frank-pledge, etc. *Charter of Md.* sec. V, XVIII and XIX." J. Brewer and L. Mayer, *Land Office in Maryland* (1871) at 1. Maryland was then in the nature of a grand-fief or honor, held by tenure of "free and common socage" [2] whereupon the Lord Baltimore presented "to the King two Indian arrows annually" in petit serjeanty [2] and "the power of sub-infeudation was expressly conferred." *Matthews v. Ward,* 10 G. & J. 443.

This power was exercised by the different "Lords Proprietary," the sale and leases of their land forming the principal portion of their resources. Consequently beginning around 1680 the Land Office became the principal office of the Province. See generally Kilty, *The Landholder's Assistant,* (1808).[3]

---

2. Socage tenure — "A species of tenure ... whereby the tenant held certain lands in consideration of certain inferior services of husbandry to be performed by him to the Lord of the fee." *Black's Law Dictionary.*

Serjeanty. "A species of tenure by knight service, which was due to the king only, and was distinguished into grand and petit serjeanty. The tenant holding by *grand* serjeanty was bound, instead of attending the king generally in his wars, to do some honorary service to the king in person, as to carry his banner or sword, or to be his butler, champion, or other officer at his coronation. *Petit* serjeanty differed from grand serjeanty, in that the service rendered to the king was not of a personal nature, but consisted in rendering him annually some small implement of war, as a bow, sword, arrow, lance, or the like." *Black's Law Dictionary.*

3. In November, 1808 John Kilty, then register of the western shore land office, sent the Md. House of Delegates a "memorial" concerning his recently completed book *The Landholder's Assistant.* He asked only that it "receive such public patronage as the work may merit." A committee of three delegates reviewed the work, finding that the author had "performed a most laborious task" which "reflects great credit upon the memorialist." They concluded that he justly made claim "to the liberality of the Legislature" and recommended that the general assembly "patronize a work of such merit and public utility." Sixty-two copies were purchased with "unappropriated money in the treasury." Laws of Md., 1808, Resol. #10; Proceedings from the House of Delegates, 1808 at 23.

The first formal instructions given by the Lord Proprietor to his Land Council in 1684 substantially remain the basic procedure for petitioning vacant land by warrant of survey or contiguous vacant land by warrant of resurvey. Md. Code, Art. 21, Title 13, Land Patents (now Real Property Article, Title 13). *Brewer and Mayer, supra,* said at 2-3:

> " ' The Land Council is first authorized to give, grant, lease or otherwise dispose of all land escheatable for want of heirs. Any error made by surveyor or clerk in certificate or patent, to be corrected, rectified and amended, as the case shall require.
>
> 'Any person owning two or three or more tracts of land contiguous or adjoining, upon application the Land Council may grant special warrant to resurvey or to lay out the same into one entire tract and grant patent for the same.
>
> 'May grant land of an alien, not naturalized, that may escheat to the Proprietary.
>
> 'Where it hath been discovered or made known to the Land Council that any grant hath been illegally or surreptitiously obtained, the Land Council are required to order *scire facias* to issue forth out of the Chancery Court of Records to the patentee or other present owner and possessor, to show cause why the same should not be vacated.
>
> 'Should the Land be adjudged and condemned to the Proprietary for the reasons aforesaid, then the Land Council may, by letters patent or otherwise, give, grant or dispose of the same to the discoverer thereof.
>
> 'The Land Council may, upon the death of the Surveyor-General, extend or continue any special warrant or warrants of re-survey.
>
> 'They cannot grant any patent for any tract of land that is part or parcel of a greater tract formerly granted.

'Authority is given to the Land Council to sign all patents legally obtained and affix the great seal.' "

For full instructions see Kilty, *supra*, at 112-117.

The process survived the Revolution as evidenced by Chapter 15 of the Act of General Assembly, April Session, 1777. This Act manifested the legislative intent that the business of the Lord Proprietor's Land Office, in respect to lands not yet granted, be assumed by and carried on under the authority of the State, rather than the Proprietary. The importance of the land office was further enhanced by the Acts of Assembly, Laws of Md., October Session, 1780, Chs. 45, 49 and 51, whereby all property of British subjects was declared confiscated for use by the State.

Although the land office was divided to accommodate the citizenry by an office and Registers on each side of the bay, the judge of the Land Office on the Western Shore was, from a very early period, the Chancellor of the State. Following the adoption of the Constitution of Maryland in 1850, a more explicit and comprehensive procedure was enacted under the administration of Governor Enoch Louis Lowe.[4] It expressly authorized the Commissioner of the Land Office to issue patents for lands, especially those lands confiscated from British subjects. Included, presumably, was Sir Robert Eden who, as Governor of the Province, was the last representative of the Lord Proprietary when the differences with Great Britain culminated in the act of formal separation by the Colonies, declaring themselves to be independent states.

## The Procedure

Although the procedural particulars have been changed from time to time, the general procedure, sufficient for our purposes here, has not. "The land office has always been, as

---

4. The last governor under the Constitution of 1776. "When the [Civil] war began he took his way to the southland and there gave moral and material support to the Confederacy. If secession was rebellion, then he was one of the most violent rebels who came out of Md.; and the final defeat of the southern cause brought a sorrow to his heart which never thereafter left it." H. Buchholz, *Governors of Maryland* (1908).

it now is, the general market in which all public lands have been offered for sale; and into which any one capable of holding real estate might come and purchase according to the prescribed rules and terms of sale . . . . If the rules of the office were complied with, and the purchase money paid, a grant for the land was issued as of course, otherwise not." *Baltimore v. McKim*, (1831) 3 Bland 453, 455-456.

Any person desiring to take up vacant lands would apply to the Commissioner of the Land Office for a warrant of survey or resurvey, directed to the County Surveyor[5] requiring him to survey the vacant land in question. After the surveyor returned the certificate of survey it was required to remain in the Land Office for six months during which time the claim was subject to caveat. If none was filed and the "whole composition or purchase money" has been paid, the applicant or successors in interest was entitled to a patent to the land. Obviously there were prescribed procedures for public notice required which varied over the years. Once the patent emanated properly signed by the Governor and sealed by the Great Seal of Maryland, no caveat could thereafter be entered. *Steyer v. Hoye*, 12 G. & J. 202, (1841).

A caveat is the procedure to oppose issuance of a patent by the Land Office. It serves as a warning to the Commissioner not to put the seal on a patent for a tract of land as prayed. A caveat unheard or unacted upon was permitted to continue no longer than twelve months, Acts of 1797, Ch. 114. The grounds upon which a caveat could be entered included a showing that no grant ought issue because it would be unjust to the public or to some individual. Upon the filing of a caveat the Commissioner would assign the cause for hearing.

Since a patentee could only take subject to all prior claims, encumbrances and equities, the decision on a caveat was not conclusive of the right. *Baltimore v. McKim*, 3 Bland at 459.

---

5. A constitutional office abolished in most counties by vote of the people in 1972 as was the position of Commissioner of the Land Office in 1966. The latter's duties have now been assumed by the State Archivist. Md. Code, Art. 21, § 13-103 (now Real Prop. Art., § 13-103).

For that reason, the general rule of the Land Office in doubtful cases was to let the patent issue, for if it were granted, the question thereafter could be brought before a court of law or equity to vacate the patent. *Jones v. Badley,* 4 Md. Ch. 167.

However in 1852 a right of appeal from the final decision of the Commissioner of the Land Office was permitted to the Court of Appeals by Chapter 361 of the General Assembly. In 1853, the Legislature assured the conclusiveness of the Commissioner's determination by declaring:

> "That the court of the commissioner of the land office, is hereby erected into and declared henceforth to be a court of record, with the same powers to preserve order, punish contempts and enforce obedience to the proper order and adjudications of the said commissioner, as are now possessed by any court of record of this State." Laws of Md., 1853, Ch. 415.

### He That Hath Land, Hath Warre at Hand[6]

To avoid the confusion of multiple praenominae by tracing title to the land in dispute, we will adopt the procedure of using "appellant" and "appellee" to include their predecessors in interest when appropriate. For those more precisely inclined we have appended our title notes grudgingly extracted from the record.

It would appear that in 1809 appellee patented two claims of vacant land — "Hope in Prospect" and "Stoney Bottom," part of which was *contiguous* to the then vacant land which is now in contention. In 1839 appellant patented a tract of over 4000 acres which appears to have *included* the land in question and which appellant entitled "Mark Amended." The 1839 patent *was not introduced* as evidence in this case but was subsequently offered as "newly discovered evidence" in a Motion for New Trial. Appellant's patentee, however, was

---

6. An English proverb more appropriately espoused by Cotgrove s, v, Gearre in 1611 as "No land without warre: he that hath land is seldome out of law."

referred to in the "being" clause of deeds dated 1852 which were introduced below by appellant as the source of its title. Motion for New Trial on the ground of the "newly discovered" patent was denied by the chancellor below, which denial is contended by appellant as an abuse of his discretion.

In 1848, four years prior to appellant's deeds, appellee applied for a warrant of resurvey which proposed to encompass all of "Hope in Prospect" and "Stoney Bottom" consisting of 369 acres which had been acquired in 1809, and the adjacent "vacant" land consisting in itself of 776 acres. The newly formed tract was to be called "Gerrard." That patent petition was all but concluded when the petitioner died. He had paid the "whole composition or purchase money," had been issued the warrant of resurvey, had the certificate filed but died while it lay in the Land Office for six months pursuant to law. The patent was never delivered to him; however, in 1874, in accordance with his daughter's petition, the patent was ultimately issued to her. There had been intervening caveats by appellant filed in 1868 when the daughter petitioned for the certification, and again in 1870, before she received it, both of which were overruled by the Commissioner of the Land Office. The caveats were detailed and clearly revealed that their claim was based upon the 1839 patent genesis. Unexplainably, however, when the hearing was set, appellant failed to appear and the Commissioner overruled the caveats for that reason.

Appellant also introduced without clarifying testimony patent issued it in 1870 pursuant to a resurvey of the first part of Mark Amended, a portion of the 4,131½ acre tract acquired in 1839:

> "In pursuance Whereof, a Resurvey was made, on the First part of the aforesaid tract of Land called "THE MARK AMENDED", and a certificate thereof returned, when the same was found to contain, with twenty eight and one half acres of vacant land added, the quantity of six hundred and fifty two acres of land, and called "MARK

AMENDED RESURVEYED". That the said Cumberland Coal and Iron Company fully compounded for the said vacancy according to law, and since by their deed bearing date the first day of March, 1870, conveyed the said land unto the Consolidated Coal Company, as appears;

The State of Maryland doth therefore hereby grant unto the said Consolidated Coal Company, the said land resurveyed as aforesaid, with the vacancy added, reduced into one entire tract, and called "MARK AMENDED RESURVEYED" lying and being in Allegany County aforesaid."

The respective title chains *after* the 1874 patent issuance are not at issue here, except for descriptive deed references to which we will later allude.

## The Issue at Hand

The land in question, located on the side of a mountain, is rough, rocky, well forested and underlain with seams of coal. Appellant is a coal company, The Maryland Coal and Realty Company, and the primary appellees[7] are Doctor and Mrs. Jonathan Eckhart. Both parties have made some use of the land over the years but due to its remoteness, they have not come to cross purposes heretofore, save in the 1870's.

One can imagine the chagrin of the appellant which had hired a consulting engineer to make a timber study only to learn from the report that the timber was gone. Apparently in 1969, without the knowledge of appellant, Dr. Eckhart had contracted with the Curry Lumber Company to cut and remove all timber then "standing and growing on Owners' [Eckharts'] land located near the village of Clarysville, Allegany County, Maryland. . . ." Its chagrin was aggravated when it became aware that the Eckharts had also sold 60,000 cubic yards of dirt from the tract. This

---

7. Although Betty Curry is also an appellee as Trustee for the Curry Lumber Company, her interest will rise or fall with the Eckharts' title. The interests of the appellee, Gerrard Company, are coincident with the Eckharts who own it.

precipitated round two of the battle for Mark Amended, coming as it did over a century after appellant's ignominious retreat from the 1870 lists.

Appellant sued appellees in trespass and negligence claiming double the value of the timber cut under Md. Code, Art. 66C, § 368, and for the ejectment of Dr. and Mrs. Eckhart who had built their home, and now reside, upon the land in question. The issue was tried before Judge Harold E. Naughton and a jury in the Circuit Court for Allegany County. Judge Naughton directed a verdict for appellees on the negligence issue and submitted the remainder of the case to the jury on the following issues:

> "1. Does the Plaintiff, The Maryland Coal and Realty Company, have good paper title to the land in dispute? [No]
>
> 2. Do the Defendants, Jonathan J. Eckhart and Sally A. Eckhart and the Gerrard Company, have good paper title to the land in dispute? [Yes]
>
> 3. Does the Plaintiff, The Maryland Coal and Realty Company, have title to the land in dispute by adverse possession? [No]
>
> 4. Do the Defendants, Jonathan J. Eckhart and Sally A. Eckhart and the Gerrard Company have title to the land in dispute by adverse possession? [No]
>
> 5. Was the Plaintiff, The Maryland Coal and Realty Company, in actual possession of the disputed land at the time of the alleged trespass? [No]"

The jury found under question 4 that the Eckharts had not acquired by adverse possession; however, on question 2, the jury found that appellees, the Gerrard Company and the Eckharts, had good paper title. The jury found against appellant on all other issues.

An albatross in the wake of every title searcher is the ominous question of whether he has gone back far enough in the chain of title. The Circe of the trial lawyer is reliance

upon headnotes as the law of a case. Both of these spectres assumed the substance of reality for appellant. It poses to us an even dozen questions:

I. Did appellant's predecessor acquire good title to "Mark Amended" by adverse possession as matter of law and convey the same to appellant by good and sufficient deed?

II. Did appellant's predecessor acquire title to "Mark Amended" by good and sufficient deeds, which were superior in title to all others claiming an interest in "Mark Amended"?

III. Did the adverse possession of "Mark Amended" by the appellant, and its predecessors in title, bar any claim to "Mark Amended" of the appellees, under the patent in 1874, issued for "Gerrard"?

IV. Did the Court err in granting Issue No. Four which permitted the Jury to find that the appellees Eckhart and The Gerrard Company had title to the land in dispute by adverse possession?

V. Did the deed from Elizabeth Hitchins, et al., to appellees in 1964 contain a legally sufficient description of "Mark Amended" to constitute good paper title?

VI. Did the patent issued to appellees' predecessors in 1874 contain a legally sufficient description of "Mark Amended" to constitute good paper title?

VII. Should the Trial Court have entered judgment as a matter of law in favor of the appellant and against appellees in the amount of $50,703.20?

VIII. Did the Trial Court err in submitting the case to the Jury?

IX. Did the Trial Court err in granting appellees' First Instruction to the Jury?

X. Did the Trial Court err in instructing the Jury with regard to constructive possession of the land in dispute?

XI. Should the Trial Court have granted appellant's Motion for Trial before the Court without a Jury?

XII. Should the Trial Court have granted a new Trial on the ground of Newly Discovered Evidence?

### Paper Title

*Newly Discovered Evidence*

By means of the contention that its motion for new trial on grounds of newly discovered evidence was erroneously denied, appellant brings to our attention an 1839 patent purportedly for the land in dispute, which if authenticated and introduced at the trial would have, according to appellant, given title by prior claim. This would have been so, one might argue, because prior to the right of appeal granted in 1852 and the establishment of the Land Office as a court of record in 1853 the appellee's 1848 patent was not conclusive because the "patentee could only take subject to all prior claims, encumbrances and equities." *Baltimore v. McKim*, 3 Bland at 459. Accepting that principle for argument's sake, the trial court did not have before it that 1839 patent. Appellant informs us that it was discovered in its large vault several days after the trial and promptly verified in the Annapolis "Hall of Records" office. Appellant argues that "the failure to discover this patent was not due to any lack of diligence on its part . . ." because "no reference to any such patent was contained in the Land Records of Allegany County and it was purely by accident that appellant discovered a copy of the same in its vault which contained hundreds of documents of all types."

The grant or refusal of a new trial is a matter of discretion with the trial judge which discretion is "not reversible on

appeal, at least when the trial court fairly exercised its discretion." *Leitch v. Anne Arundel County,* 248 Md. 611; *Murphy v. Bd. of Co. Comm.,* 13 Md. App. 497, 513. When such a motion is made on the grounds of newly discovered evidence that evidence must not have been "previously discoverable by due diligence." *Wash., Balt. & Annap. Elec. R.R. Co. v. Kimmey,* 141 Md. 243; 58 Am. Jur. 2d, New Trial § 168; J. Poe, 2 *Pleading and Practice at Law,* (Tiffany ed.), § 338 at 323.

Faced with the accidental discovery in its own vault appellant could hardly claim due diligence. Beyond that, two of the three 1852 deeds which appellant introduced contained "being" clauses referring to George Peter, who, according to appellant's argument, was the patentee in 1839. The failure to follow that lead to its Hall of Records source itself contradicts the showing of due diligence necessary to overcome the trial judge's discretionary denial. When coupled with the patent's presence in appellant's own vault, to have granted the new trial on the grounds asserted may well have been an abuse of discretion. Surely there is no showing of discretionary abuse in the denial of a new trial.

*Effective Date of Title*

We then have as the starting place of title before the court the appellee's 1848 warrant of resurvey, consummated in an 1874 patent. Appellant claims that by the obtention of its own patent in 1870 (prior to consummation of the 1848 warrant by issuance of a patent to petitioner's daughter in 1874) and by virtue of its intervening 1852 deeds, the trial court erred in instructing the jury that as a matter of law the appellee's deed provided a superior claim to title because it related back to 1848.

The instruction was not in error. The Hall of Records certification of "Gerrard" introduced in evidence by appellee shows:

| Warrant of Resurvey granted to Clary | — May 20, 1848 |
| Resurveyed | — May 19, 1849 |

618

Passed    by    Examiner
  General's Office                    —July 23, 1849
Compensation due paid               —July 23, 1849

It was noted in *Steyer v. Hoye, supra,* 12 G. & J. 202 (1841) that:

> "It is a general and well established rule of the land office, that no patent shall be issued for any land for which a patent has been previously granted; yet it often happens from inattention or accident, that this rule is not observed, *and therefore it has been laid down from a very early period that a patent always gives title by relation from the date of the certificate, special warrant, or entry in the surveyor's book,* on which the land has been particularly designated and described, Per Bland, L.L.O." [Emphasis added].

Earlier, this was authoritatively ingrained in our law in *Cunningham v. Browning,* 1 Bland 299, 326 (1827),

> "It is a well settled general rule, that under a special warrant the title to the land commences from the date of the warrant itself; because the description of its location, embodied in the warrant, has distinguished it from every other tract. The warrant is, therefore, in itself equivalent to a designation by an actual survey. *So too the title commences with the date of a warrant of resurvey,* and of an escheat, or a proclamation warrant. But upon a common warrant, it only commences with the date of the certificate of survey; or from the date of the entry of a special location upon the surveyor's book. *The land aimed at becomes thus bound, because of its having been, by some of these*

*modes, accurately described and distinctly specified. . . ."* [8]

[Emphasis added],

and was appropriately applied in the relatively more current case of *Smith's Lessee v. Devecmon,* 30 Md. 473 (1869), wherein the same sequence of events occurred as in the present case. The Court held that:

"There can, therefore, be no question of the fact that the title of the appellant to the land in controversy commenced from the date of his warrant, on the 24th of October, 1862, before Thos. Devecmon applied for his warrant. The latter could only take, under his warrant, survey and patent [Sept. 25, 1863,] a defeasible title, liable to be defeated, upon a compliance with the requirements of the law by the appellant and the issuing of a patent to him. All that was required to be done by

---

8. Cunningham becomes even more explicit at pages 324-325:

"According to the known and long established principles upon which public lands may be acquired by an individual from the State, *the title commences with the designation of the tract by the purchaser.* After the date of the designation, and before a grant has been issued, the title is inchoative, and imperfect; but when a grant has been obtained, the title is then absolute and complete. A sufficient description of the land intended to be secured gives an incipient title against every person who has not before taken some method to secure the same land. *Land Ho. Ass.* 461. It is held, upon common law principles, that the grant relates back to the date of the specification; and, by a kind of *jus postliminii,* the purchaser is deemed to have had a perfect legal title from that period to all intents and purposes whatever. 3 *Blac. Com.* 210. He may maintain an action of trespass for any injury done to the land within that interval of time; *Chapline v. Harvey,* 3 H & McH. 396; and he may, in that interval, if he has paid the whole caution money, obtain a warrant of resurvey, which is only incident to a legal title, and cannot be founded upon a mere equitable right of any kind. *Land Ho. Ass.* 152, 149, 420, 427, 447, 455. On the death intestate of the holder of such an imperfect legal title, the right decends to his heirs, as real estate, to whom alone the patent can be granted. This doctrine of relation is founded upon principles of common law altogether and exclusively . . . ."

the appellant, was performed by him in the prescribed time, and he, therefore, became entitled to his patent. This he did not obtain until the 1st day of March, 1866, and when thus obtained, it related back to October 24th, 1862, from which date his title to the land described in his patent, is now considered as perfect. No title, therefore, could, or ever did, vest in Thomas Devecmon, and consequently there is no title in the appellees. The court below erred in rejecting the appellant's prayer, which ought to have been granted and its judgment must be reversed, and judgment entered in this court for the appellant." *Id.* at 482.

It becomes undeniably clear that on the basis of the title documents *before the trial court,* appellant's patent of "The Mark Amended Resurveyed" obtained in 1870 did not supersede appellee's 1848 warrant and patent "now considered as perfect." We cannot help but note that the caveats filed by appellants in 1868 and 1870 show a clear understanding of the conflicting issues prevailing at the time and yet appellant then elected not to appear at the caveat hearing.[9] We must further note the possibility that had the 1839 patent been in evidence below and contained the description of the contested land, the result may or may not have been other than it is as to paper title. Neither we nor the court below, however, can speculate upon that which is not produced as part of our deliberations.

*Sufficiency of Description in the Appellee's Title Chain*

Appellant's broadside includes blasts upon two documents of title in appellee's chain, the 1964 deed to the Eckharts from Elizabeth Hitchins, et al. and the 1874 "Vrooman patent" issued upon, and dating back to, the 1848 application and Warrant of Resurvey. Because of a passing recitation of acreage substantially less than that described in the 1964

---

**9.** It is conceivable that appellant's predecessor in 1870 was not aware of the dating back law and failed to appear at the caveat hearing in 1870, relying upon the issuance of a patent upon the 1870 resurvey as predating the 1874 issuance of the 1848 patent, to the petitioner's daughter.

deed and the absence of the name by which appellant elects to refer to the land, "Mark Amended," it would have us disregard the Hitchins deed. Presumably appellant's contention is that the jury did not have a sufficient description in either of these documents to treat them as connecting links in appellee's chain of title.

Although appellant overlooked a metes and bounds description and an appended plat in both deed and patent proceedings apparently the jury did not. Beyond that, the deed as well as the Vrooman patent petition contained detailed and specific references to the antecedents of the lands described. That appellees called it "Gerrard" as opposed to appellant's appellation "Mark Amended" is a matter of preference which, as a result of this proceeding, has become a matter of right.

We have, therefore, responded to all of appellant's questions regarding paper title, *i.e.*, questions II, V, VI, IX and XII. We turn now to those relating to

## Adverse Possession

Appellant lists numerous acts asserting ownership by his predecessor in interest which he claims sufficient for it to have acquired title by adverse possession. The list is impressive and includes paying taxes, defending a condemnation proceeding in 1879, conveyances of property and rights of way therefrom, timber sales, and surveys. Assuming color of title, *Gore v. Hall,* 206 Md. 485, 490, the period described commences in 1879 and ends of recent date, comprising nearly one hundred years. Citing *Thistle v. Frostburg Coal Co.,* 10 Md. 129; *New Windsor v. Stocksdale,* 95 Md. 196, 214 appellant argues that "[t]his matter should not have been submitted to the jury. The matter of possession is a question of law to be determined by the Court."

We are surprised that appellant raises that question and even more so that he cited to us the very page of a case holding the negative answer. In *New Windsor,* 95 Md. at 214 the Court of Appeals met the same question appellant raises:

"But was there a question of law submitted to the jury? 'What constitutes possession,' says Mr. Poe, 'is a question of law for the Court upon the facts of the case.' Poe Pl., sec. 246. This is absolutely correct in the connection in which it is used. The learned author was dealing with the question of *adverse* possession and all of the cases cited in the note to *sec.* 246 are cases of adverse possession. What constitutes *such* possession is obviously a question of law for the Court; but whether facts exist is a question for the jury. *Matthews v. Ward,* 10 G. & J. 443; *Thistle v. Frost. Coal Co.,* 10 Md. 146; *Keener v. Kauffman,* 16 Md. 307; *Sadtler v. Peabody Heights Co.,* 66 Md. 1."

We note that *Thistle, supra,* 10 Md. 129, the other case relied on by appellant for its position, is cited by the *New Windsor* Court for the opposite understanding.

*Thistle* is even more interesting for its interpretation of the statute appellant argues supports its claim. The statute it quotes for the proposition that it need not have enclosed its adverse claim is Md. Code, Art. 75, Sec. 33, which read:[9A]

---

**9A.** That section was, however, repealed and re-enacted with amendments as Cts. and Jud. Proc. Art., § 10-909 by Chap. 2 of the 1st Sp. Sess., Acts of 1973, applicable "to all proceedings commenced after December 31, 1973, and so far as practicable to all proceedings then pending. If a court determines that it is not practicable to apply a provision of the Cts. and Jud. Proc. Art. to a proceeding pending on January 1, 1974, then that proceeding shall be concluded under the pertinent statutory provisions in effect on December 31, 1973." The new section incorporated sections 11 and 33 of Art. 75 and made other changes in both language and style. It now reads:

"(a) *Description in action at law.*—Patented land is not required to be stated by the patented name in a declaration in an action at law. It may be described by abuttals, course and distance, or a name by which it was acquired. The description shall be certain enough to identify the land.

(b) *Proof required.* — When title of patented land is questioned, a party is not required to prove that the land was patented. A patent shall be presumed in favor of the party showing a title otherwise good.

(c) *Acts of party.* — Acts of exclusive user and ownership are admissible to prove possession. Actual evidence of enclosure is not necessary for this proof."

The case *sub judice* was commenced on January 12, 1972 and concluded below on May 23, 1974. The choice of Code section is of no consequence to the result reached.

"In all actions at law, where the title to land is in question, it shall not be necessary for any party to any such action to prove that the lands in controversy have been patented; but a patent shall in all cases be presumed in favor of the party showing a title otherwise good; and actual enclosure shall not be necessary to prove possession, but acts of exclusive user and ownership, other than enclosure, may be given in evidence to the jury to prove possession."

The Court in *Thistle*, 10 Md. at 146-147, wrote of this statute:

"As the act of 1852 is in contravention of the common law, we are not disposed to give it a very *liberal* construction. Possession therefore claimed under it, must be proved with clearness and precision. It must cover the full period of twenty years, it must be adverse, exclusive and unbroken, and the acts of *user and ownership*, relied on, must be such as will comport with the character of the claim of title of him, who asserts ownership against the world, and should not consist of acts merely, which might be done by any and all persons with impunity, in common with him who claims to be the real owner."

The acts of ownership asserted on this sprawling acreage were neither exclusive nor unbroken. They jumped about sporadically from an 1879 condemnation to an 1890 resurvey, a sale in 1915, a review of marking stones "on many occasions" between 1916 and 1946, four surveys within 80 years, test borings "during the 1920's" and a timber lease in 1944. This is scarcely proof of possession "with clearness and precision."

Appellant concedes that the "uncontradicted evidence in this case discloses that while appellees and their predecessors in title had possession of certain parts of 'Gerrard,' the entire area of the land in dispute namely,

'Mark Amended,' was in the possession of appellant and its predecessors in title." [10] This concession and refutation indicate a basic question for jury determination. Both "Mark Amended" and "Gerrard" were larger tracts surrounding the peripheries of the land in contest. The respective patent applications were made to acquire title to the land in question, then "vacant" and adjoining other lands of each prospective patentee. Certainly an issue to be decided by the fact finder was whether there was constructive possession by either litigant of the disputed land under Art. 75, § 33, *supra, i.e.*, by possession of part of the larger encompassing tract claimed by them under color of patented title.

> "Generally one who has color of title, like one who has actual title, has constructive possession of the land within the outlines of his title, although he actually occupies only a part of it. However, one who enters upon the land of another, though under color of title, gives no notice to that other of any claim, except to the extent of his actual occupancy. *Thus if a true owner be in actual possession of part of the whole land to which he has record title, he is in constructive possession of all of the land which is not actually possessed by another*, who claims through color of title, and this although the owners actual possession is not within the limits of the land claimed by the other. This result has been reached by the cases because both parties cannot be seized at the same time of the same land under different titles; and the law adjudges therefore, the seizen of all that is not in the actual occupancy of the adverse party to him who has the better title." *Goen v. Sansbury*, 219 Md. 289, [Emphasis added].

Appellant's questions I, III, IV and X are thus answered. Adverse possession by appellant's predecessor in title was

---

**10.** Among the facts introduced by appellee was the existence of an old house built on one corner of the tract by appellee's predecessors and that because of this possession, appellees had constructive possession of the entire Gerrard tract.

not shown "as a matter of law" and the contrary determination by the jury is presumptively correct. The question was properly one for the jury and was decided adversely to appellant. It follows then that without a finding of adverse possession or proof of paper title by appellant there was no bar to appellee's 1848 patent for Gerrard.

Finally, appellant's contention that the question of the Eckharts' claim of adverse possession should not have gone to the jury, is without purpose. Even if the submission of the question to the jury had been error (which it was not) the finding of the jury would erase the erroneous reference. Since appellant sought the negative finding the jury made, he would be in no better position had the same finding been made as a matter of law. It is equally apparent that any issue regarding the court's instruction on constructive possession of the Eckharts was mooted when the jury found insufficient adverse possession on the part of the Eckharts.

## Conclusion

The remaining questions are resolved by the conclusions reached above. Questions VII and VIII were both founded on the appellant's erroneous understanding that "the matter of possession of land is a question of law to be determined by the Court." *Thistle, supra,* 10 Md. 129; *New Windsor, supra,* 95 Md. 196. As we have pointed out, appellant neglected to turn the page. In Question XI appellant asks whether the court should have granted its motion for trial by court rather than before a jury. Although it would appear that appellees Eckhart did not conform to Md. Rule 343 c, it is equally apparent that appellee Curry did so in that her request was filed with her first responsive pleading. Appellant ascribes no prejudice to itself nor does it give us reasons why its motion for court trial should have been granted save its opinion that a jury could not understand the complexities and, that on the first seven occasions that the case was set for trial, the parties had agreed that it would be tried without a jury. Except for appellant's motion, the record is devoid of any such agreement or of the history appellant relates.

Nor does the record indicate that the judge abused his discretion in permitting Eckhart to be tried by the jury Curry had demanded under the rule. Appellant did not move for separate trials but rather moved to deny even Curry her constitutional right to a jury by which Eckhart too acquiesced to be tried. Without separate trials it would have been an awkward case indeed had the judge answered the issues presented as fact-finder for one defendant while the jury decided them for another. The hybrid resulting would have been schismatic. It is the right of a trial by jury which is guaranteed by the Constitution, not the right of a trial by court. *Md. Comm. Developers, Inc. v. State Roads Comm'n,* 261 Md. 205. Not only do we believe that a jury could understand, we conclude that they did so.

> *Judgment affirmed.*
> *Costs to be paid by appellant.*

## *APPENDIX*

### TITLE CHAIN

| *APPELLANT* | *APPELLEES* |
|---|---|
| 1809 . . . . . . . . . . . . . . . . . . . . . . . . . | Patent for "Hope in Prospect" (335 acres) Patent for "Stoney Bottom" (34 acres) |
| 1839 . . . . Patent to George W. Peter for "Mark Amended" [*Not introduced in evidence*] | |
| 1848 . . . . . . . . . . . . . . . . . . . . . . . . | Warrant of Resurvey and Patent Application for "Hope in Prospect," "Stoney Bottom" and contiguous vacant land. En- |

## TITLE CHAIN

| *APPELLANT* | *APPELLEES* |
|---|---|
| | tire tract to be named "Gerrard." |

**1852....** Deed from Wash. Coal Co. for "Part of Mark Amended," "2d Part of Mark Amended" (being clauses from Geo. Peter), and "Hope in Prospect."

Deed from Astor Coal Mining Co. for "1st and 3d Parts Mark Amended" (being clause from Geo. Peter)

Deed from Geo. Peter, "1st and 3d Parts of Mark Amended."

**1868....** Caveat to Appellees' 1848 Patent Application

Warrant of Resurvey and Patent Application for "1st Part Mark Amended" and contiguous vacant land.

**1870....** Caveat to Appellees' 1848 Patent Application.

**1874....** Caveats overruled for failure to appear at hearing.

Patent issued on 1848 Application.