728 A.2d 755

**Alan H. PORTER**

v.

**Genevieve Yonkers SCHAFFER.**

**No. 773, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

April 29, 1999.

240

Robert H. Reinhart (Walsh, Walsh & Reinhart, P.C., on the brief), Cumberland, for Appellant.

Robert O. Kazary, Cumberland, for Appellee.

Argued before HOLLANDER, SALMON and SONNER, JJ.

HOLLANDER, Judge.

This appeal arises from a dispute between Alan Porter, appellant, and Genevieve Yonkers Schaffer, appellee, regarding ownership of three unimproved tracts of woodland, located on the northwestern side of Polish Mountain in Allegany County. Together, the three parcels of land contain approximately two hundred acres. All of the property is situated within a larger, 886 ⅚ acre tract called "Sideros," surveyed by Richard Caton[1] in 1843.

---

[1]. Richard Caton (1763–1845), founder of Catonsville, was the son-in-law of Charles Carroll, a signer of the Declaration of Independence.

The historical pedigree of the tracts has been contested for decades, and the briefs are not altogether helpful in eludicating the factual contentions. Two of the three pieces of land have historical nicknames that assist in referring to the parcels. One bears the name "Wolf Pen," and consists of 71 acres. The other, "Hornet's Nest", is a 14 acre tract situated northwest of Wolf Pen. The third tract consists of 115 acres of land, and we shall refer to it as "the third tract." Although its location is disputed, appellant asserts that the third tract is situated between Wolf Pen and Hornet's Nest, and he claims ownership by adverse possession.

On April 15, 1996, Ms. Schaffer filed an action to quiet title against Porter in the Circuit Court for Allegany County. Ms. Schaffer claimed record title ownership to all three tracts of land, stemming from her title to Sideros. In an amended complaint filed on September 17, 1996, she also claimed ownership of all three tracts, by adverse possession.[2] In his answer to appellee's amended complaint, Porter asserted record title to Wolf Pen and Hornet's Nest, and title to all three tracts by adverse possession.[3]

---

See Ann C. Devanter, ed., Baltimore Museum of Art, *Anywhere So Long As There Be Freedom: Charles Carroll of Carrollton, His Family and His Maryland* 214 (1975); George C. Keidel, *Catonsville Biographies: Richard Caton of Catonsville*, 16 MARYLAND HISTORICAL MAGAZINE 299 (1921).

2. On May 7, 1996, Porter moved to dismiss appellee's complaint on the ground that appellee failed to allege that she was in actual or constructive possession of the property. Ms. Schaffer's amended complaint averred that the land had never "been enclosed by a fence, occupied or improved by residence or other building and are wild, uncultivated and unoccupied timber lands on the west side of Polish Mountain." In addition, the amended complaint asserted that Ms. Schaffer "has been in continuous, constructive and peaceable possession of said lands under color of title" since 1951.

3. Although appellant's brief focuses its discussion of adverse possession on the third tract, the pleadings make clear that Porter's claim of adverse possession applies to all three tracts. Appellant's answer to Ms. Schaffer's amended complaint avers that "Title to *the land* is vested in this Defendant by adverse possession." (Emphasis added). There-

After a three-day trial, the court (Leasure, J.) concluded that appellee had superior record title to Hornet's Nest and the third tract. The court further concluded that although Porter's chain of title to Wolf Pen stemmed from a patent that pre-dated appellee's patent to Sideros, appellant failed to meet his burden of locating the tract within Sideros "with reasonable certainty." The court also rejected Porter's claim of adverse possession. Accordingly, the court entered judgment in favor of Ms. Schaffer. That judgment spawned this appeal. Porter presents three issues for our review, which we have rephrased slightly:

I. Did the trial court err in concluding that appellant did not establish with reasonable certainty the location of "Wolf Pen" within the present description of "Sideros"?

II. Did the trial court err in placing the burden of proof on appellant to prove his title to "Hornet's Nest?"

III. Did the trial court err in concluding that appellant did not establish title to the disputed land by adverse possession?

We answer each question in the negative. Accordingly, we shall affirm.

### Factual Background

At trial, appellee presented a chain of title to the original patent of Sideros, which was issued in 1845. Appellant's chain of title to Wolf Pen and Hornet's Nest stemmed from a deed dated March 20, 1906, conveying portions of a farm owned by Amos Robinette to Frank Troutman, appellant's predecessor in title. Appellant claimed that Robinette's interest in Wolf Pen and Hornet's Nest derived from the original patents for both tracts. The patent for Hornet's Nest was issued in 1795 to Thomas Beall of Samuel; the patent for Wolf Pen was issued in 1841 to Robinette. Appellant did not make a claim

---

fore, we shall treat appellant's adverse possession claim as applying to all three tracts of the disputed land.

of record title to the third tract, however. Rather, his claim to that tract was based entirely on adverse possession.

We shall describe each party's record title claims separately. As each party's argument involves the interpretation of land patents issued in previous centuries, it is helpful to survey, by way of background, Maryland's land patent system.

*Land Patents in Maryland*

A land patent "has been defined as a grant of some privilege, property, or authority, made by the government or sovereign of a country to one or more individuals. . . . When used in connection with real property, it means the title deed by which a government, either state or federal, conveys its lands." 1 Logan D. Fitch, *Abstracts and Titles to Real Property* § 142 (1954).

The patent process in Maryland has its roots in the charter given to George Calvert, Lord of Baltimore, by Charles I, in 1632. The Maryland Charter created in the Barons of Baltimore a "grand fief or honor, to be held of the Crown by the tenure of free and common socage," which included an annual presentation to the King of two Native American arrows as a seal of the *Lord Proprietor's* "tenure of petit sergeantry." John M. Brewer and Lewis Mayer, *The Law and Rules of the Land Office of Maryland* 1 (1871); *see also* John Kilty, *The Landholder's Assistant* (1808); *Matthews v. Ward,* 10 G. & J. 443, 450–51 (1839). When the colony of Maryland became the State of Maryland, the power of the Lord Proprietor to grant land passed to the judges of the Land Office, a position now represented by the Commissioner of Land Patents. Md.Code (1974, 1996 Repl.Vol.), § 13–201 of the Real Property Article; *see Marquardt v. Papenfuse,* 92 Md.App. 683, 690–91, 610 A.2d 325, *cert. denied,* 328 Md. 93, 612 A.2d 1316 (1992).

The transition from colony to state did not change the method for obtaining a patent, as the Land Office adopted the same warrant procedure employed by Lord Baltimore and his successors. An applicant who wished to claim vacant lands was required to apply to the Land Office for a warrant of survey or resurvey. That warrant compelled the county sur-

veyor to conduct a survey within one year of the warrant. Adjacent landowners were notified of the survey. *Maryland Coal & Realty Co. v. Eckhart,* 25 Md.App. 605, 610, 337 A.2d 150 (1975); *see* Brewer and Mayer, 12–18.

Several types of warrants could be obtained by a prospective grantee. The early case of *Cunningham v. Browning,* 1 Bland 299, 310–12 (1827), is helpful in identifying a variety of warrants.

> There were under the Proprietary's government, and still are, five different modes of beginning to obtain title to lands, or, in other words, five several kinds of warrants.... If it be his object ... to obtain a certain quantity of vacant land any where, without regard to any particular space, or tract ... the register of the land office gives him a ***common warrant***, directed to the surveyor, commanding him to lay out the specified quantity of land.... But if required by the applicant, ... the register will insert a particular description of the land ... in the warrant itself; which specification gives to it the denomination of a ***special warrant***.... But, if the applicant had already obtained a title ... and only wished to add to it some contiguous vacancy, he may obtain ... a ***warrant of resurvey***.... [I]f any one had caused a particular tract of land to be surveyed, but had failed to comply with the conditions ... and ... to take out a patent ... any one else ... may obtain ... a ***proclamation warrant*** authorizing the applicant to take up the same lands.... And finally, any one by ... setting forth that a ... tract of land had actually escheated by the death of the ... owner intestate and without heirs, may obtain immediately ... an ***escheat warrant***....

(Emphasis added); *see Marquardt,* 92 Md.App. at 691–92, 610 A.2d 325.

After the surveyor completed his work and returned a certificate of survey, the certificate remained with the Land Office for six months. During that time, any interested party could enter a caveat. The Commissioner's resolution of the caveat was final as to the patent, but it did not resolve all

questions of title in the land, because "a patentee could only take subject to all prior claims, encumbrances, and equities...." *Eckhart,* 25 Md.App. at 610–11, 337 A.2d 150. Thus, "the general rule of the Land Office in doubtful cases was to let the patent issue, for if it were granted, the question thereafter could be brought before a court of law or equity to vacate the patent." *Id.* at 611, 337 A.2d 150.

*Schaffer's Record Title to "Sideros"*

Appellee claims a direct chain of title to the original land patent of Sideros. In 1843, Richard Caton obtained a warrant of resurvey for Sideros. The resulting survey described Sideros as containing 886 ⅙ acres. Caton died shortly after the survey was completed. In 1845, however, a patent for Sideros was issued to Caton's four daughters. Subsequently, the Caton lands were placed in a trust managed by the Alexander Yearley firm of Baltimore (the "Yearley Trustees"). The Yearley Trustees continued to manage Sideros, along with the remainder of Caton's vast holdings in Allegany county, long after the last of the Caton daughters died.[4] As part of their duties, the Yearley Trustees submitted annual reports to the court. On April 5, 1922, the Yearley Trustees executed a deed conveying Sideros to "Harry W. Yonker", appellee's father.[5] The deed provided:

> NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar in hand paid, the said party of the first part [the Trustees] does hereby grant and convey unto the said party of the second part [Yonkers], all the right title and interest of the parties to said cause No. 2227 Equity, in and to a tract of land called "Sideros", situate, lying and being in Election District No. 3, in Allegany County, Maryland originally patented December 24th, 1845

---

4. For a general discussion of the contentious land disputes in Allegany County in the wake of Richard Caton's death, *see* John Marsh, *The Land of the Living: The Story of Maryland's Green Ridge Forest* 292–306 (1996).

5. We observe that, in the deed, the name is spelled as Yonker, not Yonkers.

to Mary Ann Wellesly and others for 886–1/2 [6] acres, *except so much of the same as stated in the Report of Sale above mentioned,* said original trust being described as follows:

In the 18th Report of the Trustees, filed on November 22, 1921, the trustees reported the sale of Sideros to Yonkers, but provided the following exceptions:

"... excepting the part containing 106 ⅞ acres sold to R. Bucy on June 26th, 1893, and the part containing 199 acres sold to William Somerville in September, 1913, *and also excepting all parts of said original tract to which others may have a better title than the parties to this cause.*" (Emphasis added).

On July 17, 1945, the property was conveyed to appellee in joint tenancy with her father. Following her father's death in 1951, appellee succeeded to her father's interest.

Robert Plummer, a surveyor, testified as an expert witness for Schaffer. Appellee's counsel asked Plummer to identify the boundaries of Sideros on a "deed plot" of Sideros, entered into evidence as a joint exhibit. The plot was prepared by Larry J. McKenzie, appellant's expert, in 1986. The parties also entered as a joint exhibit a survey prepared by McKenzie in 1998, which identified appellant's proposed locations of Wolf Pen, Hornet's Nest, and the third tract.[7] After examining that survey, Plummer testified that all three tracts were situated within the area of the Sideros patent. In Plummer's view, however, Wolf Pen could not be located where it is described on the 1998 McKenzie plat, because Wolf Pen's location on McKenzie's survey does not correspond to the twentieth, twenty-first and twenty-second lines of "Sugar Creek Camp." The following colloquy is relevant:

COUNSEL FOR APPELLEE: As shown on this map that Mr. McKenzie ... Wolf Pen being down here as identified

---

6. As we noted, the original patent described Sideros as having 886 *1/6* acres.

7. In McKenzie's survey, the 115 acre third tract was identified as land "Claimed by Alan Porter."

on the map ... do you agree as a surveyor to a reasonable degree of certainty used in your trade or profession that Wolf Pen is located right here where it's shown in this map?

PLUMMER: No sir, I could not say so.

COUNSEL FOR APPELLEE: Okay. Is it your testimony then that Wolf Pen cannot be located where it's located here based on the patent metes and bounds descriptions that you're aware of?

PLUMMER: Yes.

* * *

COUNSEL FOR APPELLEE: Again in the [Wolf Pen] patent itself it says the beginning point runs then with the lines of Sugar Creek Camp?

PLUMMER: It says adjacent to.

COUNSEL FOR APPELLEE: Lines twenty, twenty-one, and twenty-two as drawn. Then the obvious question, Is Wolf Pen as shown on this map adjacent to lines twenty, twenty-one, and twenty-two?

PLUMMER: No sir.

*Porter's Record Title to "Hornet's Nest" and "Wolf Pen"*

Appellant obtained a deed to Wolf Pen and Hornet's Nest in 1968. He asserts that Hornet's Nest and Wolf Pen were both part of the "Robinette Farm," which his direct predecessor in title acquired by deed in 1906.

Hornet's Nest was originally patented to Thomas Beall of Samuel in 1795. Thus, the patent for Hornet's Nest pre-dated the patent for Sideros. On December 31, 1796, Beall conveyed the property to Isaac Walton. On April 30, 1831, appellant contends that the tract was conveyed from William Wilson, who had inherited it from Walton, to Nathan Robinette.

Wolf Pen was patented to Amos Robinette in 1841. A certified copy of the patent was introduced at trial as a joint exhibit. The patent provides, in its entirety: [8]

Know ye that whereas Amos Robinett [9] of Allegany County has surveyed and laid out for him a tract or parcel of land called "Wolf Pen", lying in the County aforesaid, and containing seventy one acres, by virtue of thirty-three acres, part of a common warrant for fifty-three acres, obtained by him the tenth day of January Eighteen hundred and thirty nine, as appears, as he having fully compensated for said land according to law, the State of Maryland doth therefore hereby grant unto him the said Amos Robinett the said land called "Wolf Pen", lying in Allegany County, aforesaid, beginning at a bounded white oak, standing on the north side of the Wolf Pen Ridge, and south thirty degrees east about fifty perches [10] from Town Creek, and running thence, south eleven degrees west twenty three perches, south seventy three degrees east thirty two perches, south sixty degrees east thirty two perches, south sixty degrees east twenty perches, south eighty degrees east forty six perches, south forty eight degrees east forty perches, to three black oak saplings, growing from one stump and marked with three notches each, north thirty four degrees east twenty eight perches, south sixty two degrees east twenty perches, north fifty eight degrees east forty perches, to the centre between a hickory and white oak marked with six notches each standing at the head of a hollow, north forty-five degrees west fifty perches, north twenty seven degrees west twenty eight perches, north sixty degrees west forty six perches, north seventeen degrees west eighty five

---

8. The copy of the 1841 patent submitted as a joint exhibit at trial is, for the most part, illegible. We obtained the complete text from the original patent at the Maryland State Archives.

9. In the patent, "Robinett" is spelled without an "e".

10. A "perch" is a "measure of land containing five yards and a half, or sixteen feet and a half in length; otherwise called a 'rod' or 'pole.'" BLACK'S LAW DICTIONARY 1136 (6 th ed.1990).

perches, to a white oak marked with six notches, south sixty five degrees west thirty eight and one half perches, to two pines marked with six notches each, south thirty six degrees east sixty six perches, south fifteen degrees east fifty two perches, to a white oak marked with six notches, south twenty degrees west twenty eight perches, west twenty seven perches, north sixty degrees west thirty eight perches, north forty five degrees west thirty four perches, to a chestnut oak marked with six notches, then by a straight line to the beginning containing seventy one acres, *according to the certificate of survey thereof taken and returned into the Western Short Land Office bearing date the eighteenth day of December Eighteen hundred and twenty nine,* and there remaining together with all rights, profits, benefits and privileges therewith belonging, to have and to hold the same unto him the said Amos Robinett, his heirs and assigns forever, given under the great seal of the State of Maryland this twenty fifth day of March, Eighteen hundred and forty one. Witness the Honorable Theodorick Bland, Esquire, Chancellor.

(Emphasis added).

The certificate of survey mentioned in the Wolf Pen patent was completed by Benjamin Brown, Surveyor for Allegany County, on January 18, 1829. Brown's survey provided, in part:

By virtue of thirty three acres, part of a Common Warrant for fifty three acres, granted out of the Land Office for the Western Shore to Amos Robinett of Allegany County bearing date the tenth day of January Eighteen Hundred and Twenty Nine, which said part was by [illegible], and the nineteenth day of February Eighteen Hundred and Twenty Nine, located for the said Amos Robinett, in a Book kept by me *for the purpose of adjoining the twentieth, twenty first and twenty second lines of a Tract of land called "Sugar*

*Tree Camps"* [11] *surveyed for John [illegible] Jones, and extending from said lines east for quantity.*

(Emphasis added).

In 1905, George W. Robinette, an heir of Amos Robinette, initiated a complaint against his co-heirs to partition the Robinette Farm. By deed dated March 20, 1906, court appointed trustees of the disputed property conveyed the Robinette farm to Frank Troutman. The deed provided, in pertinent part:

> WHEREAS, by a decree of the Circuit Court for Allegany County, bearing date May 10[th], 1905, and passed in a case in said Court depending, Whereas George W. Robinette was complainant and Jeremiah Robinette et al., were defendants, the same being No. 5652, on the Equity Docket of said Court, the above [names omitted] were duly appointed Trustees, with power and authority to sell the real estate in the proceedings in said cause mentioned.

The deed described five tracts of land: "Crabtree Folly;" "Rose;" "Wolf Pen;" "Contention First Part;" and "Hornett's Nest." [12] It described Hornet's Nest and Wolf Pen as follows:

> 3rd, All that tract of land called "Wolf Pen" and beginning for the Same at a bounded White Oak on the North side of the Wolf Pen Ridge, and running thence South 11 degrees West twenty three perches South 73 degrees East thirty two perches, South 63 degrees East 20 perches, South 80 degrees East forty six perches, South 48 degrees East forty perches to three Black Oaks, North 58 degrees East forty three perches to the centre between a Hickory and White Oak, then North 45 degrees West fifty perches, North 27 degrees West twenty eight perches, North 60 degrees West forty six perches, North 17 degrees West eighty five perches to a white Oak with six notches, South 65 degrees West

---

11. Although the 1829 survey refers to "Sugar Tree Camps" in the plural, we have adopted the singular spelling that appears in more modern instruments.

12. We note that "Hornett" was spelled with two t's.

thirty eight and one half perches to a white Oak, then South 20 degrees West twenty eight perches, West twenty seven perches, North 60 degrees West thirty eight perches, North 45 degrees West thirty four perches to a Chestnut Oak, then by a straight line to the beginning. Containing Seventy One (71) Acres.

\* \* \*

5th, All that tract of land called "Hornett's Nest" And beginning at a bounded white Oak and running thence South 25 degrees West forty perches, South 51 degrees East sixty perches, North 51 degrees East twenty eight perches to a bounded Black Oak, then by a straight line to the beginning, containing Fourteen (14) Acres.[13]

The deed notes that the property contained therein was "the same lands devised by the last Will and Testament of Amos Robinette ... unto his son Moses Robinette for life, with remainder in reversion to the children and heirs at law of said Moses, who have been made parties to the proceedings in aforementioned Equity case."

On December 29, 1911, Troutman conveyed the Robinette Farm to Harry H. Bible, who, in turn, conveyed it to Robert B. Lawrence on November 2, 1912. By deed dated February 24, 1920, Lawrence conveyed the property to Omar Vance. On December 2, 1944, Omar Vance conveyed the property to Ora Vance. Thereafter, on June 12, 1968, Ora Vance conveyed the property to Charles and Charlotte Burgess. Appellant acquired his interest from the Burgesses by deed filed and recorded on June 14, 1968. The "FIRST PARCEL" conveyed in the deed is described as follows:

FIRST PARCEL: ALL that tract or parcel of land containing 2621/2 acres of land more or less, situated on Town Creek near Flintstone, Allegany County, Maryland and comprising five (5) tracts of land known as "Crabtree Folly",

---

13. We observe that the deed is inconsistent in its use of upper and lower case letters.

a tract of land called "Rose", *and a tract of land called "Wolf Pen", a tract of land called "Hornet's Nest",* all of which tracts and parcels of land herein conveyed are particularly and fully described in the deed from J.W. Scott Cochran et al [sic], Trustees, to Frank Troutman by deed dated February 19, 1906 and recorded in Liber 99, folio 295, one of the Land Records of Allegany County, Maryland, reference to which deed is hereby made for a more particular metes and bounds description of said parcel of land.

(Emphasis added).

Larry J. McKenzie testified as an expert witness for Porter. His survey of the property, previously disputed by Plummer, placed Wolf Pen to the southeast of Hornet's Nest, with the western edge abutting a small portion of "Contention, 1st Part." McKenzie stated that his survey located several of the corners described in the Wolf Pen patent. He described finding the stone pile between a hickory and a white pine, which was described as the starting point of the eighth line in the Wolf Pen patent. McKenzie also explained that "the patent called for seventy one acres and we came up with 70.83." According to McKenzie's survey, Wolf Pen intersects but does not join the twentieth, twenty first, and twenty second line of "Sugar Creek Camp."

*Adverse Possession*

Appellant presented various witnesses at trial in support of his claim of title to all three tracts by adverse possession.

Bernard Zlomack, a forester with the Department of Natural Resources ("DNR"), testified that in 1969 Porter implemented a Forest Recourse Management Plan in which the DNR helped Porter manage the land according to guidelines established by Porter. Zlomack testified that Porter's objectives for his property were to manage wildlife and timber. As part of the plan, the DNR assisted Porter in the removal, harvest, and planting of trees on the property.

Paul Smith, a logger, testified that in 1970 or 1971, he thinned trees for Porter in an area identified by the DNR as

"Circle 11". It is adjacent to Trespass Road, on the tract of land called "Contention."

Harry Hartman, also a forester with the DNR, testified that he had personal knowledge of a thirty-six inch white oak tree and a rock pile on the north slope of the mountain. He testified that a thirty-six inch white oak is approximately two-hundred years old.[14]

Porter testified that, in 1972, he commissioned a perimeter survey of the area. In addition, in 1973 he extended an existing road from his home to another road traversing the property called "Tresspass Road." Porter opened the road because the only other means of egress from Porter's property crossed a stream and was impassable when the water was high. The new road crossed portions of Wolf Pen as well as the third tract. Porter also testified that he has "never spoken to [appellee] in the thirty years [Porter has] had the property. Nobody ever said one word to [him] or complained about the boundary lines or anything...." Furthermore, he testified that no one used the property for recreational purposes without his permission.

Ms. Schaffer also produced witnesses in support of her adverse possession claim. John Trivett testified that in the early 1950's, before he entered military service in 1958, he cut timber for Ms. Schaffer north and south of Trespass Road. Harry Moyer, who was raised on Polish Mountain, testified that Harry Yonkers employed him in the early 1950's to cut timber north and south of Trespass Road. Keith Price testified that he helped Ms. Schaffer post signs on the disputed property beginning in the early 1950's. He also testified that he has seen some signs in the past "three or four years" with Porter's name on them.

Appellee, who graduated from law school in 1942, testified that she has spent most of her life on Polish Mountain. She moved there originally in 1922 when her father purchased

---

**14.** The record is unclear as to whether the thirty-six inch measurement refers to the diameter or the circumference of the tree.

Sideros. Her residence was interrupted only by a four-year period in which she lived in England, and a brief time in the Philippines in 1959. Further, she testified that she has paid taxes on the property since she acquired an interest in it in 1945. In support of her assertion, appellee furnished tax bills in the name of appellee or her father dating from 1945 to the date of trial. Even when abroad, she stated that she mailed a signed check to the tax office in Elizabeth, Maryland; employees at the tax office "figured it up, filled it out, and paid [the taxes]."

*The Trial Court's Ruling*

On August 1, 1998, the court granted Ms. Schaffer's complaint to quiet title. The order stated: "The Court determines that Plaintiff has superior record title to the property in dispute and that the defendant has failed to establish his claim of adverse possession." A written opinion filed with the order explained the court's findings of fact and conclusions of law. The court found that "the credible evidence, including the testimony of the parties' respective surveyors, establishes that the disputed acreage is within the original metes and bounds description of 'Sideros.' There is no evidence that Plaintiff or her predecessor in title conveyed any portion of 'Sideros' to Defendant or his predecessors."

The court then examined the record title claims of appellant to Wolf Pen and Hornet's Nest. Regarding Wolf Pen, the court found that even though the original patent to Wolf Pen pre-dates the patent to Sideros, appellant failed to "establish the location of 'Wolf Pen' in relation to the disputed parcel." The court said:

The original warrant of resurvey indicates the parcel adjoins Lines 20, 21 and 22 of a patent known as "Sugar Tree Camp". The surveyors for both parties agree as to the location of "Sugar Tree Camp". As plotted by the Defendant, "Wolf Pen" is not adjacent to these lines.

Similarly, the patent of "Wolf Pen" notes its beginning point to be on the "... north side of Wolf Penn Ridge and South thirty degrees East about Fifty perches from Town

Creek." With a perch equalling approximately 16.5 feet, this would cause the beginning point to be approximately 825 feet from the identified creek. In contrast, the Defendant identifies the beginning point of "Wolf Pen" as being approximately 4500 feet east of the creek.

Further, the Defendant places "Wolf Pen" as adjoining yet another patent identified as "Contention". The parties agree as to the location of "Contention", which was surveyed in 1795. The original patent of "Wolf Pen" makes no reference to "Contention" or to any other patent other than "Sugar Tree Camp." In summary, while the patent "Wolf Pen" is senior to "Sideros," the Defendant has failed to establish with any reasonable degree of certainty its location. It may or may not be within the disputed area. Therefore, Defendant's claim based on his record title must fail.

The court also concluded that the 1906 deed purporting to convey Hornet's Nest to Frank Troutman, Porter's predecessor in title, could not have done so, because Hornet's Nest had never been conveyed to Amos Robinette or his heirs. The court said:

Defendant's record claim to "Hornet's Nest" is predicated on a deed from Trustees appointed in the partition sale of the Amos Robinette Farm (No. 5652 Equity) in 1906. However, a review of that proceeding includes testimony from the Plaintiff, George W. Robinette, recorded on April 19, 1905. He was questioned regarding the property included in the farm in the following exchange:

Q. What tracts belong to the farm you have mentioned not mentioned in the will of Amos Robinette, which were acquired as part of said farm not through will.

A. Contention, Rose, *he bought Hornet's Nest at Trustee's sale but never got any deed for it* he took up Wolf Pen. [Emphasis supplied]

Since "Hornet's Nest" was never conveyed to Amos Robinette or his heirs, the record title to the Defendant is incomplete and inferior to the title of the Plaintiff.

After considering Porter's claim of adverse possession, the court found that defendant's "acts of dominion on the tract" were not "sufficiently pronounced and continuous in nature to charge the record owner with notice that an adverse claim to the property was being asserted." The court also determined that "[t]he property is unfenced and without a visible line of demarcation from other parcels." The court observed:

> Evidence of posting is somewhat unclear. The Defendant testified he has posted the perimeter with no trespassing signs. However, another defense witness indicated he helped the Defendant in posting signs, but not in the area in dispute. He described the posting taking place in other portions of Defendant's property. Further, Plaintiff disputes that Defendant posted in the disputed area and insists she has, in fact, erected no trespass notices.

In addition, the court found that Ms. Schaffer has paid taxes on the property since 1922. Further, the court rejected Porter's claim that his implementation of the DNR Forest Resource Management Plan established an adverse use. The court reasoned:

> Defendant produced evidence that for a number of years he has placed his farm, including the tract in question, in a woodland management program with the State of Maryland. The primary objectives were to provide a wildlife habitat and to improve the timber stand. As part of that plan, approximately 11,000 trees were planted in 1970. However, it appears these trees were planted in a field belonging to the Defendant which is not part of the property in dispute. As a further part of the program, trees were identified by a forester for select cutting. These were, in fact, cut by the Defendant during the 1970's. This involved approximately 100 trees in an area of approximately five acres. Some of this acreage was in the disputed area, but some was in other property belonging to the Defendant. The exact locations of this cutting was not established. Such cutting in an unenclosed area does not establish adverse possession to a tract of over 200 acres. See, *Malone v. Long,* 128 Md. 377, 97 A. 643.

On November 10, 1997, the court denied Porter's motion to alter or amend judgment. This appeal followed.

We will include other facts in our discussion of the issues.

### Discussion

 As this case was tried without a jury, we review the case both on the law and the evidence. Md. Rule 8–131(c). We will not "set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). *Barnes v. Children's Hospital,* 109 Md.App. 543, 552–53, 675 A.2d 558 (1996). The court's findings of fact are not clearly erroneous if they are supported by substantial evidence. *Walker v. State,* 125 Md.App. 48, 54, 723 A.2d 922 (1999); *Oliver v. Hays,* 121 Md.App. 292, 306–306, 708 A.2d 1140 (1998); *Nicholson Air Services, Inc. v. Board of County Com'rs of Allegany County,* 120 Md.App. 47, 66, 706 A.2d 124 (1998); *Sea Watch Stores Ltd. Liability Co. v. Council of Unit Owners,* 115 Md.App. 5, 31, 691 A.2d 750, *cert. dismissed,* 347 Md. 622, 702 A.2d 260 (1997). In making this determination, "we may not substitute our judgment for that of the fact finder, even if we might have reached a different result." *Oliver v. Hays,* 121 Md.App. at 306, 708 A.2d 1140; *Nicholson Air Services,* 120 Md.App. at 67, 706 A.2d 124. Rather, "we must assume the truth of all the evidence, and of all the favorable inferences fairly deducible therefrom, tending to support the factual conclusions of the lower court." *Oliver v. Hays,* 121 Md.App. at 306, 708 A.2d 1140; *Mercedes–Benz v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993).

 The clearly erroneous standard does not apply to the trial court's conclusions of law, however. Thus, "[p]ure conclusions of law are not entitled to any deference." *Oliver v. Hays,* 121 Md.App. at 306, 708 A.2d 1140. Moreover, we review the trial court's application of the law to the facts on an abuse of discretion standard. *Nicholson Air Services,* 120 Md.App. at 67, 706 A.2d 124; *Pierce v. Montgomery County,* 116 Md.App. 522, 529, 698 A.2d 1127 (1997).

Real Property Article § 14–108 governs an action to quiet title in real estate. That section provides:

**Quieting title.**

(a) *Conditions.* — Any person in actual peaceable possession of property, or, if the property is vacant and unoccupied, in constructive and peaceable possession of it, either under color of title or claim of right by reason of his or her predecessor's adverse possession for the statutory period, when his title to the property is denied or disputed, or when any other person claims, of record or otherwise to own the property, or any part of it, or to hold any lien encumbrance on it, regardless of whether or not the hostile outstanding claim is being actively asserted, and if an action at law or proceeding in equity is not pending to enforce or test the validity of the title, lien, encumbrance, or other adverse claim, the person may maintain a suit in equity in the county where the property lies to quiet or remove any cloud from the title, or determine any adverse claim.

(b) *Proceeding.* — The proceeding shall be deemed in rem or quasi in rem so long as the only relief sought is a decree that the plaintiff has absolute ownership and the right of disposition of the property, and an injunction against the assertion by the person named as the party defendant, of his claim by any action at law or otherwise. Any person who appears of record, or claims to have a hostile outstanding right, shall be made a defendant in the proceedings.

The purpose of an action to quiet title is to "protect the owner of legal title 'from being disturbed in his possession and from being harassed by suits in regard to his title by persons setting up unjust and illegal pretensions....'" *Wathen v. Brown,* 48 Md.App. 655, 658, 429 A.2d 292 (1981)(quoting *Textor v. Shipley,* 77 Md. 473, 475, 26 A. 1019 (1893)). In pressing such a claim, the plaintiff has the burden of establishing both possession and legal title by "clear proof." *Stewart v. May,* 111 Md. 162, 173, 73 A. 460 (1909); *see Polk v. Pendleton,* 31 Md. 118, 124 (1869)(stating that the claimant

must prove "clear legal and equitable title to land connected with possession").[15]

A helpful notation in 65 Am.Jur.2d *Quieting Title* (1972 & Supp.1998) describes the various burdens of proof that traditionally apply to a quiet title action. The notation states, in part:

### § 78 Complainant's burden of proof.

In a quiet title action, or a proceeding to remove a cloud from title, the burden of proof rests with the complainant as to all issues which arise upon essential allegations of his complaint. He must prove title in himself if the answer denies his title or if the defendant claims title adversely.... Complainant in a quiet title action must present clear or satisfactory proof of title to be entitled to relief; if the showing in this respect leaves judicial conscience in doubt, relief will be denied. As frequently stated, the complainant's right to relief depends upon the strength of his own title, not upon the weakness of the title of his opponent. Thus, it has been said that a plaintiff has no interest in land if he himself does not own it, and that whomever the court determines to be the true owner is of no concern to him. Having failed to establish title in himself, he cannot complain of insufficiency of the evidence upon which the court adjudged title to be in the defendant.

\* \* \*

### § 79 Defendant's burden of proof

Where a defendant, in an action to quiet title, substantially asserts and relies upon a fact as an affirmative issue, he

---

**15.** Although the parties have not addressed the issue, we note that "clear proof" as it is used in *Stewart* and *Polk* does not entail proof by "clear and convincing" evidence. The Court of Appeals has "consistently applied the *preponderance of the evidence* standard in cases involving private property ownership." *Urban Site Venture II Ltd. Partnership v. Levering Assocs. Ltd. Partnership*, 340 Md. 223, 229, 665 A.2d 1062 (1995)(Emphasis added). *See, e.g., Dreisonstok v. Dworman Building Corp.*, 264 Md. 50, 58, 284 A.2d 400 (1971)(ejectment); *Stottlemyer v. Kline*, 255 Md. 635, 638, 259 A.2d 52 (1969)(trespass); *Miceli v. Foley*, 83 Md.App. 541, 562, 575 A.2d 1249 (1990)(adverse possession).

must establish such fact. The burden rests upon the defendant to establish a title which he has set up to defeat the complainant's claim of ownership.... A patent, which is the highest evidence of title, is prima facie valid, and if its validity can be attacked at all, the burden of proof is upon the defendant to show how the patents were faulty or incomplete.

(Footnotes omitted).

With regard to a claim based on record title, the statute requires that the plaintiff show, at a minimum, "color of title." "Color of title" denotes "that which in appearance is title, but which in reality is not good and sufficient title." *Gore v. Hall,* 206 Md. 485, 490, 112 A.2d 675 (1955). In order for title based on a deed to "give color," it must be "so far *prima facie* good in appearance as to be consistent with the idea of good faith on the part of the party entering under it." *Id.* at 490–91, 112 A.2d 675. In *Spicer v. Gore,* 219 Md. 469, 476, 150 A.2d 226 (1959), the Court defined "color of title" as "title papers good enough in appearance and ostensible effect to give [the party claiming title] the right to the bona fide belief they held that they owned the land." *See also Baker v. Swan's Lessee,* 32 Md. 355, 358 (1870).

With these principles in mind, we turn to consider the court's analysis of the record title claims.

## I. Record Title Claims

### A. Wolf Pen

The court concluded that the patent for Wolf Pen was issued prior to the patent for Sideros. Therefore, appellant's record title claim to Wolf Pen ordinarily would be superior to appellee's, because a patent gives title by relation to the date of the surveyor's certificate. *Smith's Lessee v. Devecmon,* 30 Md. 473 (1869); *Steyer v. Hoye,* 12 G. & J. 202 (1841); *Eckhart,* 25 Md.App. at 617–19, 337 A.2d 150. Nevertheless, the court concluded that Ms. Schaffer's claim to the

land was superior to appellant's claim, because Porter "failed to establish the location of 'Wolf Pen' in relation to the disputed parcel." In reaching its conclusion, the court focused on inconsistencies between the survey prepared by McKenzie, appellant's expert, and the description found in the 1841 patent and the 1829 survey upon which the patent was issued.

As the court interpreted the 1829 survey, Wolf Pen was intended to lie parallel to the 20th, 21st and 22nd lines of "Sugar Tree Camp." But the McKenzie survey situated Wolf Pen so that it intersected a line of Sugar Tree Camp; the survey did not show Wolf Pen as parallel to it. Moreover, the court noted several other discrepancies between the McKenzie survey and the 1841 patent. For example, McKenzie placed Wolf Pen adjacent to the parcel named "Contention." Yet the 1841 patent did not mention "Contention", although "Contention" was known at that time. The court also observed that the 1841 patent began its metes and bounds description of Wolf Pen at a point fifty perches (i.e., 825 feet) from Town Creek. At trial, appellant testified that Town Creek was located considerably farther from Wolf Pen.[16] Because the court found appellant's evidence at odds with the 1841 patent and the 1829 survey, the court concluded that appellant "failed to establish with any degree of reasonable certainty" the location of Wolf Pen.

Porter attacks the court's finding on several fronts. First, he discounts the importance of the 20th, 21st and 22nd lines of Sugar Tree Camp. Although the preamble to the 1829 survey refers to those lines, the metes and bounds description in the 1841 patent does not. McKenzie testified that when the

---

16. Appellant estimated the closest distance to Town Creek to be "probably five to six hundred yards." The court stated that Porter "identifies the beginning point of 'Wolf Pen' as being approximately 4500 feet east of the creek." Appellant complains in his brief that "[t]here is no evidence in the record to support the trial court's conclusion that [appellant] identified the beginning of 'Wolf Pen' 4500 feet East of Town Creek." Even if appellant's evidence placed Town Creek five to six hundred yards from Wolf Pen (i.e., 1500 to 1800 feet), rather than 4500 feet, the distance is still considerably greater than the 50 perches (i.e., 825 feet) found in the patent.

patent description of Wolf Pen is actually plotted, Wolf Pen does not lie parallel to Sugar Tree Camp. In McKenzie's opinion, the reference in the survey to Sugar Tree Camp is an "independent description of the land." Therefore, it is not controlling.

Appellant contends that if Wolf Pen was meant to be parallel to the lines of Sugar Tree Camp, the patent description would have described the lines of Wolf Pen as running "with" the pertinent Sugar Tree Camp boundaries, or "with the lines reversed." Furthermore, appellant argues that if Wolf Pen is not located where the McKenzie survey claims, the legal descriptions of properties contiguous to Wolf Pen are jeopardized. The legal description of an adjacent tract called "West Mountain," for example, is described by reference to a stone pile at the end of the 8th line of Wolf Pen.

Additionally, appellant attacks the thoroughness of appellee's expert, Robert Plummer. Porter complains that Plummer "conducted no independent survey of 'Sideros' or 'Wolf Pen' to either confirm or refute [McKenzie's] survey." Rather, his "efforts were confined to computer plotting based upon the record description of the lands involved."

We perceive neither error nor abuse of discretion. The initial burden of proof fell on Ms. Schaffer, as the plaintiff, to show by "clear proof" that she was in possession under "color of title." She met that burden by furnishing as evidence the chain of title to Sideros, and by establishing, through expert testimony, a metes and bounds description of the Sideros patent.[17] Thereafter, the burden shifted to appel-

---

17. Because Ms. Schaffer demonstrated "color of title" by furnishing deeds dating back to the patent of Sideros, we must reject appellant's claim that Ms. Schaffer's action to quiet title fails for lack of actual or constructive possession. Maryland courts have recognized that "where a plaintiff has the legal title to lands that are wild, uncultivated, and unoccupied, he may invoke the aid of a court of equity to remove a cloud upon his title, although he has no other than constructive possession resulting from legal ownership." *Baumgardner v. Fowler*, 82 Md. 631, 640, 34 A. 537 (1896)(emphasis added); *see Barnes v. Webster*, 220 Md. 473, 475, 154 A.2d 918 (1959); *Textor v. Shipley*, 77 Md. 473, 26 A.

lant to establish his title. Ultimately, the court's ruling turned on a finding of fact as to whether the McKenzie survey was accurate in its description of the disputed property. We cannot say, upon review, that the court's resolution of that factual issue was clearly erroneous.

An integral aspect of establishing record title to real property is proving its on-the-ground location. In the early case of *Neel v. Hughes,* the Court said: "Every conveyance must either on its face, or by words of reference, give to the subject intended to be conveyed, such a description as to identify it. If it be land it must be such as to afford the means of locating it." 10 Gill & J. 7, 10 (1838). Because appellant had the burden of proving his title, it was incumbent upon him to prove not only that he had an unbroken chain of title, but also that Wolf Pen was located in the place he claimed. Here, the court found that appellant was unable to show the contours of the parcel he claimed by virtue of the Wolf Pen patent. In finding that appellant "failed to establish with any reasonable certainty its location," the court rejected appellant's evidence regarding an essential aspect of proving title.

In this regard, the case of *McDonough v. Roland Park Co.,* 189 Md. 659, 57 A.2d 279 (1948), is instructive. There, an 1849 deed conveyed a tract of land located on Smith and Old Pimlico Roads in what was then Baltimore County. The deed purported to reserve from the conveyance "the graveyard situated upon said ... parcel of ground the same to be fifty feet square and to be used only as a burial place by [the grantor] and his heirs with free ingress and egress thereto at all times hereafter by [grantor] and his heirs." *Id.* at 660, 57 A.2d 279. In 1947, ninety-eight years after the reservation, the Roland Park Company ("The Company") acquired the property and brought a bill to quiet title as to the reservation. The Company alleged that none of the conveyances since 1849 contained the reservation. Furthermore, the Company could

1019 (1893); *Wathen v. Brown,* 48 Md.App. 655, 658, 429 A.2d 292 (1981).

not locate the graveyard anywhere on the property. The evidence at trial supported the Company's claim. One long-time resident of the area testified that "there was supposed to be" a graveyard on the property, but as far as he knew no one had actually been buried there. *Id.* at 661, 57 A.2d 279. An heir of the original grantee testified that she "had always heard her mother speak of having a graveyard left to her out in the direction of Pimlico," but she did not know where it was. *Id.* at 663, 57 A.2d 279. The Court of Appeals held that having failed to establish the location of the graveyard, the heirs of the original grantor could not benefit from the 1849 reservation. The Court said: "To hold this reservation still in effect would be to hold that any part of the 30 acres conveyed by the deed was subject to the reservation, and would cloud the title to the whole 30 acres." *Id.* at 665, 57 A.2d 279. *See also Lock v. Bennartz,* 470 S.W.2d 801, 802 (1971)(holding that a plaintiff's attempt to quiet title failed because the plaintiff could not furnish "competent evidence that the description in the deed includes any or all of the real estate which is admitted by the parties to be the subject of controversy").

The more recent case of *Chappell v. Donnelly,* 113 N.C.App. 626, 439 S.E.2d 802 (1994), also provides guidance to us. There, plaintiffs sought title to a contested strip of land adjacent to their neighbor's property. As evidence of record title, the plaintiffs offered a deed that contained a metes and bounds description of the property. The plaintiffs' expert witness attacked the metes and bounds description relied upon by the defendants, but offered no proof as to the alleged boundaries. Thereafter, the trial court granted defendant's motion for a directed verdict. The intermediate appellate court affirmed, noting that the "aspect of the plaintiff's proof ... known as 'putting the land on the ground' " was a factual question to be determined by the finder of fact. *Id.* 439 S.E.2d at 805. It reasoned that testimony of a surveyor as to the location of the boundaries on the ground is necessary because " '[a]s to the identity of the land ... a deed seldom, if ever, proves itself.' " *Id.* 439 S.E.2d at 805–806 (quoting *Seawell v. Boone's Mill Fishing Club, Inc.,* 249 N.C. 402, 106

S.E.2d 486, 488 (1959)). The *Chappell* court concluded that the plaintiff "offered the deeds in their record title to establish ownership, but failed to tender any evidence indicating the on-the-ground location of the disputed boundary lines referenced in those deeds." *Id.* 439 S.E.2d at 806.

Similarly, appellant's attempted proof of record title to a portion of Sideros is insufficient unless appellant can show, by clear proof, the on-the-ground location of Wolf Pen. Therefore, the trial court's analysis properly turned on whether, as a factual matter, the McKenzie survey accurately depicted the location of the tract described in the Wolf Pen patent. In our view, the trial court's resolution of that factual determination was consistent with established principles of survey and boundary law.

The trial court properly looked to the 1829 survey as evidence of where the original surveyor intended Wolf Pen to lie. It is a fundamental principle of boundary law that the court's paramount objective in resolving boundary disputes is to fulfill the intention of the parties to the original instrument. *Zawatsky Construction Co. v. Feldman Development Corp.*, 203 Md. 182, 187, 100 A.2d 269 (1953)(observing that the principles of boundary law "are merely guides for ascertaining the intention of the parties" to the original instrument); *see Wood v. Hildebrand,* 185 Md. 56, 42 A.2d 919 (1945); *Maryland Constr. Co. of Baltimore City v. Kuper,* 90 Md. 529, 45 A. 197 (1900); *Kelso v. Stigar,* 75 Md. 376, 24 A. 18 (1892).

The 1829 survey is quite helpful in ascertaining the intent of the 1841 grant. The survey claimed, in its preamble, that it was made "for the purpose of adjoining the twentieth, twenty first and twenty second lines of a Tract of land called 'Sugar Tree Camps' ". The 1841 patent expressly stated that the grant was made to Robinette "according to the certificate of survey thereof taken and delivered into the Western Shore Land Office bearing date the eighteenth day of December Eighteen hundred and twenty nine." Therefore, the court determined that appellant's survey, which did not adjoin the

20th, 21st and 22nd lines of Sugar Tree Camp, was at odds with the original patent.

This result is also consistent with the commonly applied principle that "[a] grant calling for a survey incorporates all matters concerning that survey as if the same were explicitly contained in the grant." Joel M. Leininger, *Land Surveying*, in BOUNDARY LAW MARYLAND 1, 34 (Edward J. Gilliss et al., 1996); *see Caldwell Land and Lumber Co. v. Ervin*, 150 N.C. 41, 63 S.E. 356, 357 (1908)(stating the "rule that a line actually run by the surveyor, which was marked and a corner made, entitles the party claiming under the patent or deed to hold accordingly, notwithstanding a mistaken description of the land in the deed, *presupposes that the patent or deed is made in pursuance of the survey, and that the line which was marked and the corner which was made were adopted and acted upon in making the patent or deed, and therefore gives them controlling effect.*") (Emphasis added). Thus, "where a conveyance is about to be made, and the parties go upon the land and have the line marked and surveyed, the line so fixed and intended will prevail over any inconsistent description in [a subsequent] conveyance." 11 C.J.S. *Boundaries* § 49 (1938 & Supp.1991).

We also note that, "[a]s a general canon of boundary law, it is well-settled that a call to an adjoining boundary takes precedence over a metes and bounds description in the same instrument." *Ski Roundtop, Inc. v. Wagerman*, 79 Md.App. 357, 367, 556 A.2d 1144 (1989).[18] Therefore, as between a modern survey that is consistent with a call to an adjoining boundary and one consistent with the metes and bounds description but at odds with the adjoining boundary, the one faithful to the adjoining boundary ordinarily controls. As we see it, the 1829 survey makes clear that the metes and bounds description of the 1841 patent was intended to correspond to the lines of Sugar Tree Camp.

---

18. A "call" is "[a] visible natural object or landmark designated in a patent, entry, grant, or other conveyance of lands, as a limit or boundary to the land described, with which the points of a survey must correspond." BLACK'S LAW DICTIONARY 204 (6th ed.1990).

Furthermore, while the law generally prefers a line retraced according to natural monuments, such as a tree or an identifiable rock, *Delphey v. Savage,* 227 Md. 373, 378, 177 A.2d 249 (1962), Maryland courts have recognized that "[t]he line of an adjacent tract, if known and established, may as well be a call in a deed as a natural object." *Dundalk Holding Co. v. Easter,* 195 Md. 488, 494–95, 73 A.2d 877 (1950); *see also Ramsay v. Butler, Purdum & Co.,* 148 Md. 438, 442, 129 A. 650 (1925).

Here, the court was presented with substantial evidence that the McKenzie survey was inconsistent with other aspects of the 1841 patent, apart from Wolf Pen's relationship to Sugar Tree Camp. The patent description began at "a bounded white oak standing on the north side of Wolf Pen Ridge and South Thirty Degrees East about Fifty perches from Town Creek." Even if, as appellant contends, his testimony placed Wolf Pen some 500 to 600 yards from Town Creek, rather than 4500 feet, the closest point was certainly farther than the 825 feet called for in the patent description. In addition, the McKenzie survey begins from a point in a ravine on the western edge of Wolf Pen, not at a bounded white oak on the Wolf Pen Ridge, as called for in the patent.

We are also unpersuaded by appellant's criticism of appellee's expert. Plummer testified that he was a licensed surveyor in Allegany County who had visited the site and researched the various metes and bounds descriptions in the original patents at issue. He was admitted without objection as an expert surveyor. In a non-jury case, matters involving the credibility of witnesses and conflicts in the evidence are firmly within the purview of the trial judge, sitting as the trier of fact. *Wiggins v. State,* 324 Md. 551, 567, 597 A.2d 1359 (1991), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992); *Colvin v. State,* 299 Md. 88, 112, 472 A.2d 953, *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984); *Troy v. Hart,* 116 Md.App. 468, 475, 697 A.2d 113, *cert. denied,* 347 Md. 255, 700 A.2d 1215 (1997); *Weisman v. Connors,* 76 Md.App. 488, 500, 547 A.2d 636 (1988), *cert. denied,* 314 Md.

497, 551 A.2d 868 (1989). This rule applies with equal force to the testimony of an expert. As the trier of fact, the court was entitled to give Plummer's testimony the weight and value the court believed it should have. Our role is not to substitute our judgment for that' of the court, unless the court's factual findings are clearly erroneous. *See Gwynn v. Oursler,* 122 Md.App. 493, 502, 712 A.2d 1072, *cert. denied,* 351 Md. 662, 719 A.2d 1262 (1998); *Oliver v. Hays,* 121 Md.App. 292, 306, 708 A.2d 1140 (1998). Thus, the court was entitled to credit Plummer's testimony that Wolf Pen was not located where it was shown in the McKenzie plat.

In sum, the evidence adduced at trial supported the court's conclusion that appellant failed to identify Wolf Pen's on-the-ground location within Sideros, and that appellant failed to meet his burden of proving superior record title to the Wolf Pen tract.

## B. Hornet's Nest

▮ Appellant next contends that the trial court erred in placing upon him the burden of proving title to Hornet's Nest. As we noted, Ms. Schaffer introduced evidence of a direct chain of title to the 1845 patent of Sideros. She also introduced evidence that convinced the court that Hornet's Nest was within the territory defined by the Sideros patent. Appellant, for his part, traced title through Robinette to a 1795 patent of Hornet's Nest issued to Thomas Beall of Samuel. Because the court found that Hornet's Nest was never conveyed to Amos Robinette, one of appellant's predecessors in title, it concluded that appellant's title to the parcel was "incomplete and inferior to the title of Plaintiff."

Appellant offers no argument to rehabilitate his own record title. Rather, he attacks the court's decision to quiet title in appellee, relying on the maxim that the plaintiff in a quiet title action "must recover, if at all, upon the strength of his own title, and not by reason of the weakness of that of the defendant...." *Joseph v. Bonaparte,* 118 Md. 591, 593, 85 A. 962 (1912). Thus, appellant contends that even if he is not entitled to Hornet's Nest, neither is Ms. Schaffer, because the

Thomas Beall patent predates the Sideros patent. Appellant states: "Proving that Appellant does not have good legal title is of no benefit to Appellee who has the affirmative duty to prove her own title." If appellant's position is correct, the court below should have refused to quiet title in either party, unless it found that one or the other proved title by adverse possession.

Although appellant's argument is cast in terms of burdens of proof, we perceive another fundamental issue: In adjudicating an action to quiet title, is the court called upon to decide, as between the parties, who has the better title? Or, is the court to refrain from quieting title in either party unless one demonstrates title as against all the world? Stated otherwise, was the court below correct in quieting title in appellee despite evidence, presented by appellant *after* appellee had established *prima facie* title, that an unidentified third party may have superior title by virtue of a previous patent?

In support of his position, appellant refers us to canons of ejectment law, as articulated in *Joseph v. Bonaparte,* 118 Md. 591, 593–94, 85 A. 962 (1912). There, the Court said:

Unless the plaintiff in ejectment shows a legal title and a right to possession, not barred by the statute of limitations, he cannot recover in ejectment under the settled law of this state, no matter what may be the rule in other jurisdictions. In 1 Poe, Pl. & Prac. (4th Ed.) § 260 it is said: Three leading rules are enforced in the trial of ejectment causes: *First, the plaintiff cannot recover upon simply proving that his title is stronger or less defective than that of the defendant;* nor is it enough for him to show that the defendant had no title whatever, or not so good a one as his own, for the decision of the case does not turn upon any such comparison. He must recover, if at all, upon the strength of his own title, and not by reason of the weakness of that of the defendant, and therefore the defendant may always defeat the action by proof of a clear subsisting title in a stranger. This has always been an established principle of ejectment law in Maryland.

If "title subsisting in a stranger" defeats an action to quiet title, as it does an action in ejectment, we would agree with appellant that the court erred in quieting title in Ms. Schaffer. Evidence of the prior patent of Hornet's Nest casts some doubt as to whether the 1845 patent to Sideros conveyed Hornet's Nest. In our view, however, appellant's argument fails to take into account the difference between an action in ejectment and an action to quiet title.

 Although we have not uncovered a Maryland case directly addressing the issue, the rule in other jurisdictions is that " 'a bill to quiet title may not be defeated by showing that the plaintiff's interest, otherwise sufficient to support the bill, is subject to possibly superior rights in third persons not parties to the suit ... It is enough that the interest asserted by the plaintiff in possession of land is superior to that of those who are parties defendant.' " *Sheldon v. Moyer*, 210 N.W.2d 597, 599 (Iowa 1973) (quoting *United States v. Oregon*, 295 U.S. 1, 24–25, 55 S.Ct. 610, 79 L.Ed. 1267 (1935)). This is in contrast to the rule in ejectment. In Fitch's treatise, we find the following statement:

> The possession which confers jurisdiction in [an action to quiet title] must have been acquired in a lawful way, though the complainant is not bound to show a perfect title as against all the world, *as is the case of one seeking to recover possession.*

Logan D. Fitch, 2 *Abstracts and Titles to Real Property* § 517 (1954)(footnotes omitted)(emphasis added).

Similarly, in *Moore v. Barker*, 186 Okla. 312, 97 P.2d 776, 779 (1939), the Supreme Court of Oklahoma stated the rule as follows:

> It is the prevailing rule in this jurisdiction that in a statutory action to quiet title, plaintiff must recover, if at all, upon the strength of his own title, and not on the weakness of his adversary's claim. *It is not necessary that the plaintiff have title paramount to all others, but he must at least have some interest in title and that interest must be paramount to the claim of his adversary.*

(citations omitted)(emphasis added). *See also Rucker v. Dooley,* 49 Ill. 377 (Ill.1868)(stating that "We do not understand that a plaintiff in a suit to quiet title is bound to show a perfect title as against all the world, *as in the case of a party seeking to recover possession.*") (Emphasis added).

We believe the rule articulated in the foregoing authorities appropriately reflects the difference between an action in ejectment and an action to quiet title. Historically, quiet title was an equitable remedy, whereas ejectment was a remedy at law. Prior to the merger of law and equity in 1984, *see* Md. Rule 2–301, plaintiffs were required to determine, as a matter of pleading, whether to proceed in equity or law. The fundamental difference between the two was the question of possession. The "ground of equity jurisdiction" in a bill *quia timet* was the fact of actual or constructive possession. *Barnes v. Webster,* 220 Md. 473, 475, 154 A.2d 918 (1959); *see Thomas v. Hardisty,* 217 Md. 523, 529, 143 A.2d 618 (1958); *Textor v. Shipley,* 77 Md. 473, 475, 26 A. 1019 (1893). Thus, when an owner was not in possession, a bill *quia timet* would not lie, because the owner could resort to the legal remedy of ejectment. *See Glorius v. Watkins,* 203 Md. 546, 549, 102 A.2d 274 (1954)(rejecting equity jurisdiction because the plaintiff was not in possession, stating: "Equity entertains jurisdiction where, although the complainant fears vexatious litigation due to a cloud on his title, he nevertheless cannot sue in ejectment because he is already in possession.").

Possession by the putative owner continues to be a distinguishing feature of an action to quiet title. In 1955, the Legislature enacted Md.Code (1951, 1955 Repl.Vol.), Art. 16 § 128, the predecessor to the current quiet title provision, now found in R.P. § 14–108. *See* 1955 Md. Laws, Chap. 376. Real Property § 14–108 requires a claimant to prove "actual peaceable possession of property" or, in the case of wild lands, "constructive and peaceable possession of it." R.P. § 14–108(a). Ejectment actions involving tenant-landlord disputes and remedies for unlawful possession of the premises after the delivery of a deed were placed in the original jurisdiction of the district court. *See* R.P. § 8–402 through § 8–402.2; R.P.

§ 14–109. In all other cases, "a person who is not in possession of property and claims title and right to possession" may bring an action for ejectment in the circuit court, pursuant to R.P. § 14–108.1. Nevertheless, in *Thomas v. Hardisty, supra,* 217 Md. at 530, 143 A.2d 618, the Court of Appeals made clear that the quiet title statute did not "derogate or in any way conflict[ ] with" the "firmly established" jurisdictional divide between quiet title and ejectment. *See Romney v. Steinem,* 228 Md. 605, 608, 180 A.2d 873 (1962); *Cherry v. Siegert,* 215 Md. 81, 85, 136 A.2d 754 (1957)(stating that the 1955 statute was "merely declaratory of the law as it existed prior to June 1, 1955").

 Possession is relevant to a discussion of the burdens of proof in the following sense. In an action in ejectment, it is the defendant who has possession. A possessor should not be ousted by one whose title is weakened by the claim of a third party, because as between a possessor-defendant and the person seeking ejectment, the possessor has a stake in the property, by virtue of his possession, which outweighs the stake of a non-possessing plaintiff whose title is inferior to that of a third party. In a quiet title action, however, the plaintiff, and not the defendant, must prove possession and a legal claim to title *before* the burden is shifted to the defendant to establish superior title. Therefore, unlike an action in ejectment, the defendant in a quiet title action who cannot establish his own record title has no basis to complain about the strength of the plaintiff's title, even if a third party may have a superior record title claim.

 To be sure, a plaintiff must establish, as part of a *prima facie* case, the legal right to possession, either by "color or title or claim of right by reason of his or his predecessor's adverse possession for the statutory period." R.P. § 14–108(a). Here, appellee met that burden. She established a direct chain of title to a State patent that purported to convey the land at issue. Thereafter, appellant sought to prove his record title, but he was unable to do so to the court's satisfaction. Significantly, Porter does not challenge the court's

determination as to his own title in the property. Rather, he contends that his evidence concerning the 1795 patent to Thomas Beall should have prompted the court to shift the burden of proof back to Ms. Schaffer, to show that her claim is superior to whomever may legitimately boast title by virtue of the 1795 patent. To shift the burden in this way would require appellee to prove title as against an unidentified person who has not appeared to defend his or her rights as against appellee. Because appellant has not met his burden of proof, the relative strength of appellee's title as against the rest of the world is of no concern to him. Therefore, the trial court was correct in its application of the burdens of proof.

Our conclusion is consistent with the view that "actions to quiet title should not be hampered by needless anomalies, and that the marketability of title should be encouraged and protected whenever it is possible under the law." *Peruzzi Bros., Inc. v. Contee,* 72 Md.App. 118, 129, 527 A.2d 821 (1987)(citing *Cherry v. Siegert,* 215 Md. 81, 136 A.2d 754 (1957)). The war of paper concerning the Caton lands has continued for decades. Appellant urges that title may not be quieted in Hornet's Nest because of a possible claim by an unidentified third party who has not stepped forward to assert his right. In our view, that is not a basis to deny appellee's request to quiet title as to appellant.

Ms. Schaffer's established title in Sideros was sufficient to justify the court's conclusion regarding record title. Therefore, we turn to consider appellant's adverse possession claim.

## II. Adverse Possession

Appellant challenges the court's finding regarding adverse possession. In our view, the trial court was neither clearly erroneous nor legally incorrect in concluding that appellant had not shown "actual, open, [and] notorious" possession of the property. *Barchowsky v. Silver Farms, Inc.,* 105 Md.App. 228, 241, 659 A.2d 347, *cert. denied,* 340 Md. 301, 666 A.2d 1236 (1995).

In order to establish title by adverse possession, "a claimant must show continuous possession of the property for 20 years in an actual, open, notorious, exclusive, and hostile manner, under claim of title or ownership." *Barchowsky*, 105 Md.App. at 241, 659 A.2d 347; *see Costello v. Staubitz*, 300 Md. 60, 67, 475 A.2d 1185 (1984); *East Washington Railway Co. v. Brooke*, 244 Md. 287, 294, 223 A.2d 599 (1966); *Goen v. Sansbury*, 219 Md. 289, 295, 149 A.2d 17 (1959); *Miceli v. Foley*, 83 Md.App. 541, 552, 575 A.2d 1249 (1990). In evaluating a claim, the pertinent inquiry is whether the claimant has proved the elements "based on the claimant's 'objective manifestation' of adverse use, rather than on the claimant's subjective intent." *Barchowsky*, 105 Md.App. at 241, 659 A.2d 347 (quoting *Miceli*, 83 Md.App. at 552, 575 A.2d 1249). Moreover, the claimant bears the burden of proof. *Costello*, 300 Md. at 67, 475 A.2d 1185; *see Hungerford v. Hungerford*, 234 Md. 338, 340, 199 A.2d 209 (1964).

The trial court rejected appellant's claim because, in its view, appellant failed to show that "his possessory acts of dominion on the tract were sufficiently pronounced and continuous in nature to charge the record owner with notice that an adverse claim to the property was being asserted." The court focused on three aspects of appellant's proof. First, the court discounted appellant's claim that he had posted no trespassing signs on the property. The court noted that "the property is unfenced and without a visible line of demarcation from other parcels" and that another defense witness testified that much of Porter's posting occurred on other portions of appellant's property, not the area in dispute. Moreover, the court credited Ms. Schaffer's testimony that she erected no-trespassing signs on the property.

The court also rejected appellant's contention that open and notorious possession was established by the inclusion of the disputed property in a woodland management program. The court found that the trees planted as part of the management program were planted on a field belonging to Porter that was not part of the contested land. Furthermore, the court found that the approximately 100 trees felled as part of the program

were confined to a small five-acre area, only part of which was located in the disputed territory. Relying on *Malone v. Long,* 128 Md. 377, 97 A. 643 (1916), the court concluded that "[s]uch cutting in an unenclosed area does not establish adverse possession to a tract of over 200 acres." The court also considered that appellee, and not Porter, had paid taxes on the property in question since 1922.

We are mindful that adverse possession claims depend in part on the nature of the land in question. In *Goen v. Sansbury, supra,* 219 Md. at 296, 149 A.2d 17, the Court explained:

> [I]n determining whether there has been actual possession of property, there must be considered its character and locality, and the uses and purposes for which it is naturally adapted, since possessory acts of an outlying and uncultivated piece of land may be proved by acts of ownership somewhat different from those required with regard to land under enclosure and actual cultivation.

Thus, acts sufficient to demonstrate possession of wild, undeveloped forest may fall short of the activity needed to establish possession of developed property. Nevertheless, something more than "mere occasional use of land" is needed. *Barchowsky, supra,* 105 Md.App. at 241, 659 A.2d 347. With regard to unenclosed timberland, the Court of Appeals has held that "evidence of the cutting and hauling of timber therefrom is not itself sufficient, because such acts might be nothing more than successive trespasses." *Gore v. Hall,* 206 Md. 485, 490, 112 A.2d 675 (1955); *Malone v. Long,* 128 Md. 377, 380, 97 A. 643 (1916); *Peters v. Tilghman,* 111 Md. 227, 240–41, 73 A. 726 (1909).

As we see it, the court was entitled to conclude that appellant proved little more than the sort of "occasional use" described in *Barchowsky.* The court found, as a matter of fact, that the woodlands management program affected only a small portion of the land appellant claims by adverse possession. The fact that the disputed land appears in the aerial map of appellant's conservation zone is not dispositive, as very

little tangible effort to assert dominion over the property resulted from its inclusion in the boundaries of the DNR program.

Appellant relies on *Peters v. Staubitz*, 64 Md.App. 639, 498 A.2d 661 (1985), for the proposition that "there are circumstances in which the creation of an animal sanctuary (wildlife habitat) might constitute an actual use for purposes of adverse possession." In *Staubitz*, a claimant asserted title by adverse possession to a fenced, triangular lot on the banks of the Whitehall River in Anne Arundel County. Part of the property had been developed by the claimant and contained a boat landing, boathouse, privy, and a barbecue fire pit. The rest of the land was left "in its wild state as [the claimant] wished the land to be an animal sanctuary." *Id.* at 646, 498 A.2d 661. After a non-jury trial, the court found that the claimant had established adverse possession to the entire lot. On appeal, however, this Court reversed as to the wild lands. Judge Rosalyn Bell, writing for the Court, said:

> The evidence ... does not support the court's finding that appellee acquired title to the remainder of the triangle where the animal sanctuary is located. Under some circumstances, a claimant's creation of an animal sanctuary might constitute an actual use for purposes of adverse possession. In this case, however, there is no evidence that appellee used the animal sanctuary. He merely allowed "[a] large part of the disputed triangle ... to grow wild [because he] desires the wild nature of the ground as an animal sanctuary ..." This is not sufficient.

*Id.* at 647, 498 A.2d 661.

Although we agree that use of land as an animal sanctuary *may*, in some circumstances, constitute actual possession, appellant's aspirations for the woodlands at issue here do not rise to the level contemplated by the Court's *dicta* in *Staubitz*. We are satisfied that the trial court did not err as to appellant's adverse possession claim.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**