Rowe v. Lavanway, No. 1159-02 CnC (Katz, J., Sep. 22, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                 SUPERIOR COURT

Chittenden County, ss.:                         Docket No. 1159-02 CnCv

ROWE

v.

LAVANWAY

FINDINGS OF FACT,
CONCLUSIONS OF LAW AND
NOTICE OF DECISION

This matter was tried to the court September 1, 2004, after a view

on site.  On the basis of the evidence presented, and the view where indicated, the following decision is announced.

FINDINGS OF FACT

1.  Plaintiffs Rowe and Banschbach own land and a home alongside Palmer Lane, Jericho.  They seek a declaration that their land is not burdened with a right-of-way benefitting the lands of LaVanway to their north.

2.  LaVanway owns a good deal of acreage to the north of Rowe. He claims a right-of-way extending northerly from Palmer Lane, across the easternmost lands of Rowe and Banschbach, terminating at and affording access to his meadow.

3.  LaVanway's chain of title includes a deed from 1881, Eastman and Nutting to Brown, containing the following language:

> *Said Brown his heirs or assigns are forever to have the right to pass through other lands now owned by said Eastman and Nutting in the lane as it now is in passing to and from the land hereby conveyed to said Brown for all purposes whatever.*
>
>          \*     \*     \*
>
> **We also hereby mean to convey to the said Brown the lane about thirty-feet wide on the southeasterly side of the land now occupied by Levi Nutting as a pasture and**

**leading to land now and heretofore owned
by said Brown, and bounded on the
southeasterly side by land now belonging to
Harmon Sherman's Estate.  Said Brown
agrees to put up all bars in the lane in
passing to and from the land hereby
conveyed.**

TO HOLD SAID GRANTED PREMISES WITH THE
APPURTENANCES THEREOF FOREVER.

(We have used italics to denote what at trial was referred to as the "pink"
language, boldface to denote what at trial was referred to as the "yellow,"
and small caps to denote what at trial was referred to as the "purple.")

4.  We are persuaded that the boldface (yellow) language just
quoted constitutes the description and grant of the lane at issue in this
case.

Rowe's chain of title includes a deed from 1883, Eastman to Nutting,
which describes the parcel therein conveyed with the following language:

. . . bounded north by land of Rugus Brown,
east by the lane running north to said Brown's
land  . . . .

Many years ago, crude stone walls were erected generally along either
side of the lane.  The interior width between those parallel walls is about
22 feet, sometimes less.

5.  LaVanway's predecessor in title, one Higgins, maintained he enjoyed the right-of-way, and expressed that view to Bortz, a predecessor of Rowe.  Bortz knew nothing of any such right of Higgins, apparently believing that if it was not mentioned in his own deed, it must not exist.

6.  Bortz installed a driveway leading to his house site on what is now the Rowe land.  This driveway proceeded northerly down the right-of-way at issue from Palmer Lane and then curved westward toward the house.  To construct this driveway, and make it suitable and convenient for automobile passage, Bortz graded the lane in dispute.  Where it had been marked by a gully running down its center, Bortz pushed the earth so as to flatten it.  When he got to the point of curving, Bortz's excavator, one Tinker Lamphere, broke through the westerly stone wall, probably using some of the stones as base material.  Some additional quantity of those stones, from the now destroyed section of wall, were also placed along the outside of the driveway curve.  These were depicted by Bortz in his "plan view" drawing made on the witness stand.  Court's Exhibit 1.  As so depicted, they might have had the effect of tending to block use of the right-of-way or constitute an act hostile to passage along it.  On a subjective level, however, there was no evidence that Bortz directed his excavator to so place the stones.  Nor was there any evidence that the excavator knew anything of the potential dispute between Bortz and Higgins regarding the right-of-way.

7.  More significantly, those stones did not last very long in that position.  Bortz's snowplower, one Bobby Clark, found those stones to interfere with his dispersal of snow.  So, with Bortz's approval, Clark pushed the stones over the edge of the driveway, down into the gully that

marked the continuation of the disputed lane. This is shown on the "section view" drawing, Court's Exhibit 2, accepted by Bortz on the witness stand and annotated by him to indicate both the "break" in the stone wall where the driveway proceeds out of the lane and the "Bobby Clark" stones (agreed by Bortz as the irregularly edged circles).

8. The effect of this driveway has been to create something of a berm, impeding travel along the lane if one is coming from the LaVanway lands to the north, and requiring a drop of perhaps three feet if one comes from the south, Palmer Lane. This estimate of height comes both from the view by the court and from photos E2 and E3 which show the berm/driveway behind plaintiffs' young daughter, who appears perhaps three years of age and less than four feet in height. Although the driveway and berm may constitute something of an impediment to ordinary auto travel, we are not persuaded that it would block a four-wheel drive vehicle; indeed LaVanway testified that he drove his Jeep up the driveway and onto the lane.

9. The driveway has remained in place well over fifteen years, perhaps more than 30.

10. The visual effect of the driveway and berm is precisely that—a level driveway and sloping base necessary to create it from material found on the site. That visual effect would not and should not be viewed by the objective observer as "Bortz is deliberately blocking access along the lane."

11. Bortz noted that when he constructed his driveway, trees along the lane were perhaps 1½ inch saplings, rendering the way impassable to

vehicles. These trees appeared to be natural forest growth and not the result of any purposeful planting by people. Such a situation implies non-use; it also implies fairly recent non-use, as the growth, at the time, was new.

12. The northern terminus of the disputed lane was long marked by barbed wire. But this was part of the enclosure of a significant portion of what is now the LaVanway meadow, perhaps as large as ten acres. Coupled with the fact that only a few large trees are located along the lane and that even 30 years ago Higgins claimed a right to pass along the lane, hence that the lane continued to be used, we are not persuaded this barbed wire ever actually prevented access nor would have been viewed as having that purpose.

## CONCLUSIONS OF LAW

A.  Creation of the right-of-way by the 1881 deed is supported by a preponderance of the evidence.

B.  Mere failure of subsequent grantees in either respective chain to include mention of the right-of-way can have no effect on its continued validity. Barrett v. Kunz, 158 Vt. 15, 18 (1992).

C.  Mere non-use of the right-of-way does not initiate any loss of the right. County of Addison v. Blackmer, 101 Vt. 384, 391 (1928). When created by a grant, non-use must be coupled with evidence of an affirmative intent to abandon to extinguish the easement. Annot. Loss of Private Easement by Nonuse, 62 A.L.R.5th 219, at § 3 (1998). Hence, no matter how large or numerous the trees may

have become, that is an irrelevant fact.  It only signals non-use.

D.      We reject plaintiffs' contention that failure to include words of inheritance in the sentence creating the right-of-way renders it a mere personal license of Rufus Brown, which would not have survived him or which he could not have conveyed.  In interpreting the 1881 deed, it is our duty to ascertain the intention of the parties to it, as best we can.  Blackmer, 101 Vt. at 389; Blanchard v. Morey, 56 Vt. 170, 174 (1883).  The absence of words of inheritance in the granting clause is overcome by words in the habendum showing that a fee was to be conveyed.  Blair v. Blair, 111 Vt. 53, 57 (1940); Deavitt v. Washington County, 75 Vt. 156, 161 (1903).  In this case, words of inheritance were not used in the habendum either, but the word "appurtenances" is.  There are only two possible appurtenant easements in the deed, the italicized (pink) language and the bold (yellow).  Both create easements and each satisfies the criteria for an easement appurtenant because they serve a parcel of land, providing access to it over the servient lands of the grantors, and this benefit only ran to Brown, personally, so long as he owned the dominant parcels.  Barrett, 158 Vt. at 18.

E.      Therefore, to give meaning to the word "appurtenances," the parties must have intended both easements to be appurtenant to their respective parcels.  This is further supported by the rule of construction that an easement appurtenant is favored over one that construes the easement in gross.  Scott v. Leonard, 119 Vt. 86, 98 (1956).  We conclude that the small caps (purple) language of Plaintiff's Exhibit H16 is that instrument's habendum clause and that the right-of-way or lane must be considered an appurtenance of

the parcel for which it provides ingress and egress.

F.      As an easement appurtenant without any specific restrictions, the right-of-way attached to the dominant land, in this case fee simple parcel from Eastman and Nutting, and transferred along with it through the chain of title.  Restatement of Property § 487 cmt. d (1944) ("When once an easement becomes appurtenant to a dominant tenement, the easement follows, unless prevented by the manner or terms of its creation, the possession of the dominant tenement."); id. at cmt. c ("It can rarely happen that anything in the manner of the creation by prescription of an easement appurtenant will prevent it from passing with the possession of the dominant tenement as an appurtenance thereof."); see also 4 R. Powell & P. Rohan, Powell on Real Property §34.15 (1999) (". . . it accompanies the dominant tenement as an appurtenance thereof, if not specifically excluded.").

G.      When LaVanway's predecessors, by whose 1881 conveyance this lane was created, two years later convey the parcel which eventually becomes Rowe and Banschbach's (plaintiffs'), with language referring to right-of-way here disputed as "the lane running north to said Brown's land," the above conclusions of appurtenance and permanence (interest in fee) are bolstered.

H.      To divest the interest of an easement, the holder of the servient estate must make clear an intention to work an ouster—in the words of the cases must unfurl the flag in a manner which is notorious as well as hostile.  Darling v. Ennis, 138 Vt. 311, 313–14 (1980).  It must consist of a clear and affirmative blocking of the

right-of-way. This is measured by an objective view of the conduct asserted to constitute a hostile act; the subjective intent or belief of the actor (here Bortz) is irrelevant. Pecor Auto Sales, Inc. v. Nesti, No. 2000-320, slip op. at 2 (Vt. June 29, 2001) (unpublished mem.), citing Russell v. Pare, 132 Vt. 397, 404 (1974); Hilliker v. Husband, 132 Vt. 566 (1974); Cardenas v. Kurpjuweit, 779 P.2d 414, 417 (Idaho 1989); Porter v. Schaffer, 728 A.2d 755, 774 (Md. 1999); Otto v. Cornell, 349 N.W. 2d 703, 705 (Wis. Ct. App. 1984). Here, the driveway construction, with its resulting berm, must objectively be considered as just that—a driveway with the berm of earth necessary to support it. Although it may somewhat impede travel along the disputed lane, it is nothing that a few yards of fill could not remedy. Its purpose, viewed merely from the site, rather than from the witness stand, is simply to create a driveway, not to block the dominant estate. Having in mind that that the fifteen year period is a statute of limitation, construction of the driveway would not have put Higgins (predecessor of LaVanway) on notice that Bortz was attempting to oust him from his easement. The fact that the stones from the long-standing wall were placed first by excavator Lamphere and next by snowplower Clark at their own behest, rather than by instruction of Bortz, is interesting, but actually irrelevant. It must be the objective manifestation of ouster which controls. Here that is insufficient.

I.      There was no limitation on the grantee's use in the 1881 instrument creating the right-of-way. None should be imported because the passage of time has seen the replacement of horses by automobiles and, sadly, cows by ATVs. Skow v. Goforth, 618 N.W.2d 275, 278 (Iowa 2000); Hodgkins v. Bianchini, 80 N.E.2d 464, 467

(Mass. 1948); <u>Swensen v. Marino</u>, 29 N.E.2d 15, 18 (Mass 1940) ("We should be very slow to hold that even ancient rights of way, not expressly restricted as to the type of vehicle . . . could not be employed at all for the means of transportation in common use by a succeeding generation.").

## NOTICE OF DECISION

We therefore expect to enter a judgment, suitable for recording, declaring that the lane in question, 30 feet in width, remains an easement appurtenant to the lands of LaVanway.

Dated at Burlington, Vermont, _____, 2004.

_____
Judge